# EXHIBIT T



**USDA**

**United States Department of Agriculture**

# Follow-Up to Animal and Plant Health Inspection Service's Controls Over Licensing of Animal Exhibitors

This report was revised and reissued on February 22, 2022, to correct and clarify some narrative information. These revisions had no impact on the report's findings, conclusions, recommendations, or post audit actions.

**Audit Report 33601-0003-23**

**March 2021**

OFFICE OF INSPECTOR GENERAL

# Follow-Up to Animal and Plant Health Inspection Service's Controls Over Licensing of Animal Exhibitors

## Audit Report 33601-0003-23

OIG evaluated APHIS' controls over the licensing of exhibitors of dangerous animals and the agency's efforts to safeguard both the animals and members of the public who visit exhibitor facilities.

## OBJECTIVE

To evaluate APHIS' controls over the licensing of exhibitors of dangerous animals, and the agency's efforts to safeguard both the animals and members of the public who visit exhibitor facilities. As part of this audit, we followed up on the recommendations from our previous audit issued June 2010 with emphasis on the recommendations relating to public safety.

## REVIEWED

OIG interviewed APHIS officials and analyzed pertinent documents, complaint procedures, the Risk Based Inspection System, and inspection reports.

## RECOMMENDS

APHIS should conduct a study to determine if there continues to be an issue with public barriers at licensed exhibitors with potentially dangerous animals and determine if APHIS has the authority under the AWA to require exhibitors to report animal escapes and/or attacks to APHIS. APHIS also should document reasons for canceling regulatory proposals and implement controls to ensure inspections are timely completed.

## WHAT OIG FOUND

Under the Animal Welfare Act (AWA), the Animal and Plant Health Inspection Service (APHIS) regulates the use of certain warm-blooded animals in research, exhibition, and commerce in order to ensure their humane treatment. All facilities that exhibit animals regulated under the AWA must be licensed with APHIS and be inspected on a periodic basis.

We reviewed the corrective actions APHIS implemented following a June 2010 Office of Inspector General (OIG) audit. While we found that APHIS implemented corrective actions for six of the seven recommendations, APHIS did not fully implement one recommendation. Specifically, APHIS developed a work plan to amend the regulation for defining public barriers and reporting all escapes and attacks involving dangerous animals; however, the plan did not ultimately result in regulatory change and the proposed regulatory change was canceled. APHIS could not explain why the proposed change was canceled, nor why it did not create a new work plan, because the agency regulatory tracking database did not capture the necessary information.

We also found that 24 out of 84 (more than 28.5 percent) inspections conducted at the 19 exhibitors in our sample were deemed late. This occurred because APHIS relied solely on the supervisory animal care specialists to monitor the completion of inspections without any other compensating controls to accomplish this monitoring. As a result, APHIS cannot fully ensure the safety of the animals exhibited or the safety of the public who view those animals. APHIS agreed with our findings and recommendations, and we accepted management decision on the four recommendations.



**OFFICE OF INSPECTOR GENERAL**
United States Department of Agriculture

**DATE:**  February 22, 2022

**AUDIT**
**NUMBER:**  33601-0003-23

**TO:**  Kevin Shea
Administrator
Animal and Plant Health Inspection Service

**ATTN:**  Robert Huttenlocker
Deputy Administrator
Marketing and Regulatory Programs-Business Service

**FROM:**  Gil H. Harden
Assistant Inspector General for Audit

**SUBJECT:**  Follow-Up to Animal and Plant Health Inspection Service's Controls Over
Licensing of Animal Exhibitors

This report presents the revised results of the subject audit. We regret any inconvenience these
revisions may have caused APHIS, and we appreciate the agency's continuous assistance. Your
initial written response to the official draft report, dated February 19, 2021, is included in its
entirety at the end of this report. Excerpts from your response and the Office of Inspector
General's position are incorporated into the relevant sections of the report. Based on your
written response, we accepted management decision for all four audit recommendations in the
report.

As part of an internal quality control process, we identified errors in the report we issued on
March 12, 2021. Consequently, we revised the report to address these errors. Ultimately, these
revisions resulted in no material impact on the reported findings, conclusions, and
recommendations. Therefore, further response from APHIS will not be required.

Please continue to follow your agency's internal procedures in forwarding documentation for
final action to the Office of the Chief Financial Officer. In accordance with Departmental
Regulation 1720-1, final action needs to be taken within 1 year of each management decision to
prevent being listed in the Department's annual Agency Financial Report.

Again, we appreciate the continued courtesies and cooperation extended to us by members of
your staff. This updated report contains publicly available information and will be posted in its
entirety to our website (http://www.usda.gov/oig) in the near future.

# Table of Contents

**Background and Objectives** ................................................................ 1

**Finding 1:  Additional Action Needed for Deficiencies Noted During the Prior Audit** ....................................................................................................... 4

    **Recommendation 1** ..................................................................................6

    **Recommendation 2** ..................................................................................6

    **Recommendation 3** ..................................................................................7

**Finding 2:  APHIS Needs to Improve the Timeliness of Inspections Conducted of Licensed Exhibitors** ............................................................................ 8

    **Recommendation 4** ..................................................................................9

**Scope and Methodology** ..................................................................... 10

**Abbreviations** ..................................................................................... 12

**Exhibit A:  Results of Prior Audit Recommendations** ...................... 13

**Agency's Response** ............................................................................. 15

# Background and Objectives

## Background

Under the Animal Welfare Act (AWA), the Animal and Plant Health Inspection Service (APHIS) regulates the use of certain warm-blooded animals in research, exhibition, and commerce in order to ensure their humane treatment.[1]  As part of its mission, APHIS Animal Care is charged with providing leadership in:  (1) determining standards of humane care and treatment of animals, (2) implementing those standards, and (3) ensuring compliance with those standards through inspection, education, and cooperative efforts.[2]  All facilities that exhibit animals regulated under the AWA must be licensed with APHIS and be inspected on a periodic basis.  As of December 2019, there were 2,245 Class "C" (Exhibitor) licensees nationwide.[3]

APHIS Animal Care is headquartered in Riverdale, Maryland, with an operational office located in Fort Collins, Colorado.  To ensure compliance with the AWA, APHIS inspectors must inspect all licensed facilities.  The inspectors are located throughout the United States and conduct both announced pre-license inspections and unannounced routine and/or focused inspections on a periodic basis.  As of December 11, 2019, the APHIS organizational chart designated that there were positions for 3 assistant directors that oversee the 14 supervisory animal care specialists (SACS); the SACS supervise 66 veterinary medical officers (VMO) and 43 animal care inspectors (ACI).  During fiscal year (FY) 2019, APHIS inspectors performed over 2,800 inspections of exhibitors in their assigned geographic areas.[4]

Animal exhibitors are public or private entities that exhibit animals to the public.[5]  Examples of exhibitors include individuals, public zoos, roadside zoos, circus/traveling exhibitors, and State parks.  APHIS requires licensed exhibitors to provide their animals with adequate care and treatment in the areas of housing, handling, transportation, sanitation, nutrition, veterinary care, and protection from extreme weather and temperatures.[6]  Exhibitors must maintain, on their premises, accurate records of the animals that come into their possession and of the veterinary care the animals receive.[7]  Exhibitors must minimize possible harmful risks to animals and the public during public exhibition.[8]  Specifically, any animal must be handled to minimize the risk of harm to the animal and to the public, with sufficient distance and/or barriers between the animal and the general viewing public to assure the safety of animals and the public.[9]

When APHIS inspectors identify items that are not in compliance with Federal standards, APHIS holds those facilities responsible for properly addressing and correcting those items within a

---

[1] The AWA is codified at 7 U.S.C. §§ 2131 *et seq*.
[2] APHIS Animal Welfare Assessment (2007).
[3] Class "A" and "B" licenses are issued to breeders, brokers, and dealers.
[4] Both VMOs and ACIs conduct inspections of exhibitors.  For the purpose of this audit, both will be referred to as APHIS inspectors.
[5] 7 U.S.C. § 2132(h).
[6] 9 C.F.R. § 2.100(a); *see also* 7 U.S.C. § 2143(a).
[7] 9 C.F.R. § 2.75 (a)-(b).
[8] 9 C.F.R. § 2.131 (a)-(e).
[9] 9 C.F.R. § 2.131(c)(1).

specified timeframe. APHIS inspectors record the results of their inspections in the online Animal Care Information System (ACIS). To determine the timing of inspections, APHIS developed a Risk Based Inspection System (RBIS) to ensure that resources are effectively targeted and that entities with a "high risk" for noncompliant items (NCI) are inspected more frequently.[10] APHIS uses factors, such as the number and severity of NCIs recorded in ACIS and potential for human injury through direct contact with dangerous animals, to determine inspection frequency for each exhibitor.[11] The AWA authorizes the Secretary of Agriculture to suspend or revoke an exhibitor's license for any violations of the AWA or the agency's regulations and standards.[12]

**Prior Audit**

In 2010, we evaluated APHIS' controls over the licensing of exhibitors of exotic animals and the agency's efforts to safeguard both the animals and members of the public who visit exhibitor facilities.[13] The audit found that APHIS inspectors did not report safety conditions because the inspectors were challenged by APHIS' broadly-worded guidance while evaluating compliance at the facilities. We noted several instances in which APHIS inspectors either did not identify safety-related deficiencies during inspections, or did not document the conditions and require corrective actions due to the lack of periodic onsite supervision. We recommended that APHIS issue clear regulations and guidance that define what constitutes a sufficient public barrier and require exhibitors to report all escapes and attacks involving dangerous animals to APHIS' ACIs. APHIS agreed to develop a work plan[14] for a change in regulation and issue revised guidance. The audit also found that APHIS renewed United States Department of Agriculture (USDA) exhibitor licenses to individuals who could not provide evidence that they actually exhibited their animals. Additionally, APHIS inspectors were unable to timely locate traveling exhibitors (for example, circuses) to conduct inspections. APHIS agreed with the findings and achieved final action on all recommendations. Since the previous report was issued, APHIS implemented a process to better utilize its subject matter experts, and increased SACS' oversight of the APHIS inspectors through use of onsite supervision during inspections. Additionally, APHIS issued a new regulation that removed the license renewal process for exhibitors; specifically, licensees must reapply for their license every 3 years, instead of automatically being renewed upon payment of fees.[15]

---

[10] High risk exhibitors include but are not limited to: facilities with any critical NCI, any repeat NCI, or four or more non-repeat, non-critical NCIs cited on an inspection report (such as "unsatisfactory" inspection results).

[11] Dangerous animals include: lions and tigers (and other "big cats"), wolves (and other "large wild/exotic canids"), bears, elephants (and other "mega herbivores"), and great apes.

[12] 7 U.S.C. § 2149(a).

[13] Audit Report 33601-10-Ch, *Controls Over APHIS Licensing of Animal Exhibitors,* June 2010.

[14] A regulatory work plan is a document prepared by APHIS officials that describes the change in regulation that APHIS plans to develop. The work plan assesses the risk, significance, and effects of the proposed regulatory change. The Office of Management and Budget uses the work plan to designate the proposed regulatory action as "significant" or "not significant".

[15] Animal Welfare; Amendments to Licensing Provisions and to Requirements for Dogs, 85 Fed. Reg. 28,772 (May 13, 2020).

**Objectives**

To evaluate APHIS' controls over the licensing of exhibitors of dangerous animals, and to evaluate the agency's efforts to safeguard both the animals and members of the public who visit exhibitor facilities.  As part of this audit, we followed up on the recommendations from our previous audit, issued June 2010, with emphasis on the recommendations relating to public safety.

Our audit did not identify any deficiencies in the licensing of animal exhibitors.  We evaluated APHIS' final actions for all seven recommendations from the previous audit. (See Exhibit A). For Recommendations 2, 3, 4, and 7, the final actions taken by APHIS corrected the issue previously identified.  For Recommendations 5 and 6, APHIS initially did not take action beyond obtaining an Office of the General Counsel (OGC) opinion.  However, in May 2020, APHIS issued new regulations that addressed the Office of Inspector General's (OIG) previously noted concerns related to Recommendations 5 and 6.[16]  Recommendation 1 is addressed in Finding 1 of this audit.

---

[16] Animal Welfare; Amendments to Licensing Provisions and to Requirements for Dogs, 85 Fed. Reg. 28,772 (May 13, 2020).

## Finding 1:  Additional Action Needed for Deficiencies Noted During the Prior Audit

We reviewed the corrective actions APHIS implemented following the June 2010 OIG audit.[17]
While we found that APHIS implemented corrective actions for six of the seven prior
recommendations, APHIS did not fully implement one recommendation beyond the work plan
and the issuance of guidance.[18]  Specifically, APHIS developed a work plan to amend the
regulation for defining public barriers and reporting all escapes and attacks involving dangerous
animals; however, the plan did not ultimately result in regulatory change.  The proposed
regulatory change was canceled; therefore, known deficiencies from the prior audit may not have
been corrected.  Additionally, APHIS officials stated that guidance could not be issued without
the regulatory change and, therefore, had to rescind the previously issued guidance.  Since the
agency regulatory tracking database did not capture a reason why the change was not
implemented, APHIS could not explain why the proposed change was canceled, nor why it did
not create a new work plan.  Without this regulatory change, as noted in the previous audit,
APHIS cannot adequately ensure the safety of the animals exhibited or the safety of the public
that views those animals.

According to Departmental regulation, USDA agencies and staff offices are required to establish,
maintain, evaluate, improve, and report on systems of controls.  When control deficiencies are
detected, they must be promptly corrected by the agency.[19]  In addition, APHIS inspectors are
required to ensure that exhibitors provide a sufficient distance and/or barrier to keep the animals
and public safe.[20]

We reviewed the prior audit's corrective actions and interviewed APHIS officials to determine if
APHIS fully implemented the audit's recommendations.  In this audit, we found that APHIS
provided direct supervision to its inspectors, improved its ability to track the location of traveling
exhibitors, and implemented a process to better utilize its subject matter experts.  Additionally,
APHIS issued new regulations that removed the license renewal process for exhibitors.

We found that APHIS had implemented corrective actions for six of the seven recommendations
from the prior audit.  However, APHIS did not fully implement one of the recommendations
beyond the work plan and issuing guidance.[21]  During the previous OIG audit, we found
potential safety hazards at licensed exhibitors due to APHIS' broadly-worded guidance.[22]  For
example, we previously reported that, at one facility, the public barrier was so close to a cougar
enclosure that a visitor could reach across the barrier and insert a hand into the enclosure.  At
another facility, the "public barrier" consisted of a plastic chain as low as 12 inches above the
ground.  This facility provided tours to groups of school children who could easily cross the
barrier to access the cages with dangerous animals.  APHIS inspectors for both facilities did not

---

[17] Audit Report 33601-10-Ch, *Controls Over APHIS Licensing of Animal Exhibitors*, June 2010.
[18] Audit Report 33601-10-Ch, *Controls Over APHIS Licensing of Animal Exhibitors*, June 2010.
[19] USDA Departmental Regulation (DR) 1110-002, *Management's Responsibility for Internal Control*
(June 17, 2013).
[20] 9 C.F.R. § 2.131(c)(1); see also 7 U.S.C. § 2146(a).
[21] Audit Report 33601-10-Ch, *Controls Over APHIS Licensing of Animal Exhibitors,* June 2010.
[22] Audit Report 33601-10-Ch, *Controls Over APHIS Licensing of Animal Exhibitors,* June 2010.

take action on these hazards.  APHIS officials stated that, due to the vague language of the regulations, it is difficult for ACIs to determine whether a public barrier is or is not sufficient. The previous audit also noted there were escapes of animals at licensed exhibitors that APHIS was unaware of because APHIS did not require exhibitors to report escapes and/or attacks to the agency.

APHIS agreed with OIG's recommendation to issue clear regulations and guidance that define what constitutes a sufficient public barrier and to require exhibitors to report all escapes and/or attacks involving dangerous animals to APHIS' ACIs.[23]  APHIS agreed to develop a work plan for a change in regulation and to issue guidance.  APHIS officials stated that the completed work plan was designated as significant by the Office of Management and Budget and an economic analysis was required.[24]  Therefore, APHIS officials performed an economic analysis, which was completed in January 2014.

For the next 5 years, APHIS took no further action.  Then, in March 2019, APHIS senior officials determined the regulatory change would need a new work plan if the agency still thought a change was necessary.  When asked for the reason that APHIS had not taken action prior to March 2019, APHIS officials were unable to provide an explanation, as it was not documented in their regulatory document tracking database.[25]  The March 2019 decision was documented solely in an email without any support or analysis regarding the continued need of the regulatory change.  APHIS officials stated that, without the regulatory change, they had no authority to specify standards and therefore had to rescind the previously issued guidance.  While we are unaware of any issues caused by APHIS' inaction, the agency is still required to correct known deficiencies.  Additionally, due to the significance of the regulatory process, we recommend the agency ensures that the justifications behind removing any proposed regulations are documented.

We discussed our continued concerns about the broadly-worded public barrier guidance and the lack of a reporting requirement with APHIS officials.  Due to the time span since the last audit, the officials suggested a study be conducted to determine if public barriers were still an issue.[26]  Although APHIS officials had agreed with this recommendation in the previous audit, the current APHIS officials stated they would need to determine whether a requirement for exhibitors to report on animal escapes and/or attacks could be enacted under the AWA.[27]

---

[23] Audit Report 33601-10-Ch, *Controls Over APHIS Licensing of Animal Exhibitors,* June 2010.
[24] When an agency determines that a regulation is the best available method of achieving the regulatory objective, it shall design its regulations in the most cost-effective manner to achieve the regulatory objective.  An economic analysis evaluates the costs and benefits of enforcement and compliance to the Government, regulated entities, and the public. (E.O. 12866, "Regulatory Planning and Review," 58 Fed. Reg. 51735, Oct. 4, 1993).
[25] APHIS used a database to track the progress of regulatory changes sought by the agency.
[26] Our fieldwork phase coincided with the Coronavirus Disease 2019 (COVID-19) pandemic.  APHIS inspectors were not performing inspections at this time.  Therefore, we also were unable to perform site visits to licensed exhibitors during this audit.  This did not affect our ability to achieve our audit objectives.
[27] During the previous audit (Audit Report 33601-10-Ch, *Controls Over APHIS Licensing of Animal Exhibitors*, June 2010), APHIS officials did not raise concerns about their authority to require exhibitors to report on animal escapes and/or attacks.

Since APHIS regulations concerning public barriers and reporting of escapes and/or attacks have not changed, the public safety issues noted during the previous audit may still persist. APHIS' broadly-worded guidance of public barriers potentially increases the risk of injury to the exhibited animals and the public who view those animals. Therefore, we recommend APHIS conduct a study to determine if there continues to be an issue with public barriers and implement any necessary corrective actions. Additionally, guidance that requires licensed exhibitors to report escapes and/or attacks may decrease the potential reoccurrence of these incidents at the location of the occurrence and other facilities. If APHIS inspectors know how an animal escaped, inspectors can identify similar flaws in exhibits they inspect to prevent similar escapes or attacks. Furthermore, a requirement for reporting incidents may allow APHIS to better evaluate the risk posed by each licensee. Therefore, we also recommend that APHIS determine if it has the authority under the AWA to require exhibitors to report animal escapes and/or attacks, and, if authorized, take action to ensure exhibitors report animal escapes and/or attacks to APHIS. In addition, we recommend APHIS document the procedures for removing any proposed regulations in order to better track the justification for the removal.

## Recommendation 1

Conduct a study to determine if there continues to be an issue with public barriers at licensed exhibitors with potentially dangerous animals. If the results indicate an issue, determine and implement the necessary corrective actions (i.e., new regulations, training, and/or guidance).

### Agency Response

In its February 19, 2021, response, APHIS agreed with the recommendation and stated:

> APHIS will conduct a barrier study at licensed exhibitors including the 19 facilities that OIG selected as part of the 2020 audit. The study will include a review of any incidents involving barriers that have occurred at these facilities. As part of this review, barriers will be measured for height and distance from primary enclosures and photographed; then submitted to the Animal Care species specialist team for assessment and evaluation.

The estimated completion date is December 31, 2021.

### OIG Position

We accept management decision on this recommendation.

## Recommendation 2

Consult with OGC to determine if APHIS has the authority under the AWA to require exhibitors to report animal escapes and/or attacks to APHIS. If APHIS does have the necessary authority, take action to ensure exhibitors report animal escapes and/or attacks to APHIS.

**Agency Response**

In its February 19, 2021, response, APHIS agreed with the recommendation and stated:

> APHIS will contact the USDA OGC to determine if APHIS has the authority under the AWA to require reporting of escapes and/or attacks. If OGC determines that APHIS does have the authority to require reporting, then APHIS will develop an action plan to require reporting. This action plan will be based on OGC recommendations and may include promulgating regulations and/or stakeholder announcements, letters to licensees, tracking escapes/attacks, and working with facilities to prevent further incidents.

The estimated completion date is March 31, 2022.

**OIG Position**

We accept management decision on this recommendation.

# Recommendation 3

Document the procedures for canceling a regulatory proposal, including the reason for any removal.

**Agency Response**

In its February 19, 2021, response, APHIS agreed with the recommendation and stated:

> Animal Care's National Policy Staff office will track regulatory proposals, including the reasons for removal. Animal Care will modify the Regulatory Work Plans Standard Operating Procedures (SOP) to include documenting a regulatory proposal that has been cancelled and the reason for any removal.

The estimated completion date is March 31, 2021.

**OIG Position**

We accept management decision on this recommendation.

## Finding 2:  APHIS Needs to Improve the Timeliness of Inspections Conducted of Licensed Exhibitors

We found that 24 out of 84 (more than 28.5 percent) inspections conducted at the 19 exhibitors in our sample were not conducted at the RBIS frequency and were deemed late.  This occurred because APHIS did not establish or maintain sufficient controls to ensure its supervisors adequately monitored the timely completion of inspections.  Specifically, APHIS relied solely on the SACS to monitor the completion of inspections without other compensating controls to accomplish this monitoring.  As a result, APHIS is potentially not identifying welfare issues for exhibited animals and safety risks for the public that views those animals.

Departmental regulations require USDA agencies and staff offices to establish, maintain, evaluate, improve, and report on systems of controls.[28]  According to the RBIS Standard Operating Procedures, APHIS' risk categorization utilizes a standard risk formula, incorporating the probability of occurrence of NCIs and the potential for negative consequences, to determine the level of risk at a facility.[29]  Inspection frequencies at licensed exhibitor's facilities can range from 3 months to 3 years.[30]  APHIS guidance requires APHIS inspectors to conduct inspections at high risk facilities on or before the RBIS-generated deadline date.  If the inspectors are unable to conduct timely inspections, the inspectors are required to contact their assigned SACS prior to the deadline so that another inspector can be assigned to conduct the inspection.[31]

During the previous audit, we did not note any issues with APHIS adhering to RBIS inspection frequencies.[32]  As part of the current audit, we compared RBIS inspection frequencies to inspection documentation from October 2017 to December 2019 for the 19 exhibitors in our sample to determine if APHIS inspectors conducted their inspections within the RBIS deadlines.  Specifically, we assessed APHIS' adherence to the RBIS inspection frequencies for exhibitors of dangerous animals to ensure the agency safeguarded the animals and the public who visited licensed exhibitor facilities.  We found that 24 out of 84 (more than 28.5 percent) of the inspections were not timely conducted.  These inspections were between 2 and 412 days late.  Additionally, we found that one traveling exhibitor in our sample was not inspected for multiple years, despite the exhibitor having submitted the required travel itineraries.[33]

When we inquired about the late inspections, APHIS officials stated that inspectors are required to review their ACIS-generated RBIS report to determine the individual inspection deadlines for each facility.  APHIS agreed that 14 of the 19 exhibitors in our sample had late inspections.  However, the officials were unable to comment on 9 of the 24 late inspections for reasons such as the staff members responsible for those inspections were no longer with the agency; furthermore, there is no requirement for APHIS inspectors to document the justification for

---

[28] USDA DR 1110-002, *Management's Responsibility for Internal Control* (June 17, 2013).

[29] USDA APHIS, Risk Based Inspection System (RBIS) Standard Operating Procedures (July 2018).

[30] USDA-APHIS, *Risk Based Inspection System* (Dec. 3, 2020), https://www.aphis.usda.gov/aphis/ourfocus/animalwelfare/SA_AWA/CT_AWA_Risk_Based_Inspection_System.

[31] USDA APHIS, *APHIS Animal Welfare Inspection Guide* (Aug. 2019).

[32] Audit Report 33601-10-Ch, *Controls Over APHIS Licensing of Animal Exhibitors,* June 2010.

[33] Traveling exhibitors are required to submit their itineraries at least 2 days prior to exhibition so that APHIS inspectors can inspect the licensee while the animals are away overnight from their approved site.

missing an inspection deadline. APHIS officials stated that inspection deadlines may have been missed because there were no inspectors assigned to those facilities for a period of time. Additionally, we were informed that APHIS assistant directors did not monitor adherence to RBIS inspection frequencies and that the SACS were responsible to ensure inspections were completed. However, the officials stated that the lack of staff and high turnover made it difficult to monitor the completion of inspections even though every inspector was assigned to a SACS at all times.

During our discussions with APHIS officials, we were notified of instances where the RBIS frequency was incorrect due to system updates in ACIS. These updates disrupted the calculations for the inspection frequency and resulted in what appeared to be infrequent and late inspections. We did not take exception to late inspections attributed to ACIS data integrity errors in this report, as the data integrity issue will be reported in a forthcoming OIG audit.[34]

Without controls to monitor APHIS inspectors' adherence to RBIS frequencies, APHIS is potentially not identifying welfare issues for exhibited animals and safety risks for the public that views those animals. Therefore, we recommend that APHIS implement controls for assistant directors to monitor RBIS adherence by field staff. APHIS officials stated that the agency plans to deploy a new information system that would allow RBIS frequency information to be monitored by any level of APHIS staff. APHIS officials also agreed to develop procedures to require that the assistant directors monitor staff's adherence to RBIS frequencies.

## Recommendation 4

Develop and implement controls for Animal Care assistant directors to monitor adherence to RBIS frequency to ensure that inspections are conducted in a timely manner.

**Agency Response**

In its February 19, 2021, response, APHIS agreed with the recommendation and stated:

> Animal Care's section of APHIS' eFile database and tracking system will be modified to allow Animal Care's Assistant Directors to monitor RBIS frequencies to ensure that inspections are conducted in a timely manner.

The estimated completion date is April 30, 2021.

**OIG Position**

We accept management decision on this recommendation.

---

[34] Audit Report 33601-0002-31, *Animal Care Program Oversight of Dog Breeders,* June 2021.

## Scope and Methodology

We performed our audit at APHIS Headquarters in Riverdale, Maryland. Due to the COVID-19 pandemic, we were unable to complete onsite visits to the exhibitors as originally planned. This affected our approach to evaluate the efforts of APHIS to safeguard both the animals and members of the public who visit exhibitor facilities. Our approach was modified to a review of APHIS' inspection documentation and interviews with APHIS personnel. We conducted our fieldwork from December 2019 through September 2020.[35]

Our universe consisted of the 2,245 exhibitors with active APHIS licenses as of December 2019.[36] We reviewed documentation for 790 exhibitors that had infractions between October 2017 and December 2019 to identify exhibitors that had multiple infractions.[37] We found there were 25 exhibitors with 10 or more infractions.[38] We reviewed the previous inspection reports of the 25 exhibitors to identify those that had exhibited dangerous animals. We non-statistically selected all nine licensees that exhibited dangerous animals to the public. We then looked at exhibitors in the same States as those 9 exhibitors, and selected an additional 12 exhibitors that had 4 or more infractions and dangerous animals in their inventory.[39]

To accomplish our objectives, we performed the following procedures:

- interviewed APHIS officials and analyzed pertinent documents, which included public laws, procedures, and policies related to the issuance of USDA exhibitor licenses;
- reviewed APHIS' procedures to ensure that complaints were investigated and handled in a timely manner;
- analyzed APHIS' RBIS to determine if APHIS was performing compliance inspections in a timely manner;
- reviewed the 84 inspection reports for 19 USDA licensed exhibitors between October 2017 and December 2019 for timeliness and adherence to APHIS guidance; and
- interviewed SACS, ACIs, and VMOs to determine the scope of their duties and the procedures they follow.

During the course of our audit, we gained an understanding of the existence, usage, and impact of the information system, ACIS. We interviewed agency officials regarding ACIS data collection, validation, and reliability. We assessed the reliability of ACIS data by comparing the nonstatistical sample of FYs 2018 and 2019 inspection reports to data in ACIS to ensure the

---

[35] We followed up on all recommendations from the prior audit report, 33601-10-Ch, *Controls Over APHIS Licensing of Animal Exhibitors*, issued June 2010. Our follow-up was limited to determining if APHIS implemented the agreed upon corrective actions.
[36] On December 9, 2019, APHIS provided OIG with a listing of all active exhibitors as of that date. In addition, APHIS provided OIG with read-only access to ACIS to obtain inspection and animal inventory data.
[37] After our review of records within the primary scope of our audit, we also reviewed FYs 2013–2017 documentation for one exhibitor. APHIS did not inspect this exhibitor's travel site between FY 2013 and FY 2019 despite APHIS having the exhibitor's itineraries. (See Finding 2).
[38] For the purpose of this audit, infractions included all NCIs, attempted inspections, and teachable moments.
[39] Of the 21 exhibitors, 2 were later removed from the sample. One exhibitor left the program and another exhibitor's inventory no longer included dangerous animals.

ACIS data we relied on were complete and accurate. In addition, we consulted APHIS officials and reviewed documentation for each inspection we took exception to in order to confirm the accuracy of our data.

We assessed internal controls significant to the audit objectives. In particular, we assessed:

| Component | Principle |
|---|---|
| Control Environment | The oversight body and management should demonstrate a commitment to integrity and ethical values |
| Control Environment | Management should establish an organizational structure, assign responsibility, and delegate authority to achieve the entity's objectives |
| Control Environment | Management should demonstrate a commitment to recruit, develop, and retain competent individuals |
| Control Environment | Management should evaluate performance and hold individuals accountable to their internal control responsibilities |
| Risk Assessment | Management should define objectives clearly to enable the identification of risks and define risk tolerances |
| Control Activities | Management should design control activities to achieve objectives and respond to risks |
| Control Activities | Management should implement control activities through policies |
| Information and Communication | Management should use quality information to achieve the entity's objectives |
| Information and Communication | Management should internally communicate the necessary quality information to achieve the entity's objectives |
| Information and Communication | Management should externally communicate the necessary quality information to achieve the entity's objectives |

Because our review was limited to these internal control components and underlying principles, it may not have disclosed all internal control deficiencies that may have existed at the time of this audit.

We conducted this audit in accordance with Generally Accepted Government Auditing Standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Abbreviations

ACI...........................................animal care inspector
ACIS ......................................Animal Care Information System
APHIS....................................Animal and Plant Health Inspection Service
AWA ......................................Animal Welfare Act
C.F.R......................................Code of Federal Regulations
COVID-19..............................Coronavirus Disease 2019
DR ..........................................Departmental regulation
FY ..........................................fiscal year
NCI.........................................noncompliant item
OGC .......................................Office of the General Counsel
OIG ........................................Office of Inspector General
RBIS.......................................Risk Based Inspection System
SACS......................................supervisory animal care specialist
U.S.C......................................United States Code
USDA.....................................United States Department of Agriculture
VMO ......................................veterinary medical officer

## Exhibit A:  Results of Prior Audit Recommendations

The table below lists the results of APHIS' implementation of prior audit recommendations from Audit Report 33601-10-Ch, issued June 2010.

| Recommendation Number | Recommendation Detail | Recommendation Fully Implemented?[40] |
|:---:|:---|:---:|
| 1 | Issue clear regulations and guidance that define what constitutes a sufficient public barrier and require exhibitors to report all escapes and attacks involving dangerous animals to APHIS ACI. | No |
| 2 | Implement a process to better utilize resident animal experts that would require ACIs to submit technical questions in order to evaluate the safety of any newly-designed enclosure areas for dangerous animals, and establish a time-phased plan to review all existing facilities. | Yes |
| 3 | Implement a process to ensure that APHIS personnel determine the cause of dangerous animal escapes or attacks, document the corrective actions taken, and ensure that this information is readily available to all ACIs when evaluating similar facilities in their respective jurisdictions. | Yes |
| 4 | Implement procedures requiring periodic onsite supervisory visits to ensure that inspections of exhibitor facilities meet APHIS standards in a consistent manner. | Yes |
| 5 | Obtain and document advice from the Office of the General Counsel (OGC) to determine whether APHIS can deny an individual's request for a USDA exhibitor's license renewal if that individual cannot prove he or she had exhibited animals to the public.  If so, implement procedures for | Yes[41] |

---

[40] We followed up on all recommendations from the prior audit report, 33601-10-Ch, *Controls Over APHIS Licensing of Animal Exhibitors*, issued June 2010.  Our follow-up was limited to determining if APHIS implemented the agreed upon corrective actions.

[41] APHIS initially chose to take no action to prevent licensees who do not exhibit their animals from renewing their licenses.  However, in May 2020, APHIS issued regulations to make all exhibitors' licenses non-renewable.  Animal Welfare; Amendments to Licensing Provisions and to Requirements for Dogs, 85 Fed. Reg. 28,772 (May 13, 2020).  Because the regulation was issued outside the scope of our audit, we did not evaluate the effectiveness of the action.

| | | |
|---|---|---|
| | ACIs to verify licensees' exhibiting activities in cases where this is considered questionable at the time of license renewal. | |
| 6 | If OGC issues an opinion that regulatory changes would be required, implement regulations to require that licensees provide verifiable documentation of exhibiting activities, if requested, before renewing an existing license. | Yes[42] |
| 7 | Establish a timeframe for implementing the proposed regulations that would specifically require traveling exhibitors to submit and maintain current travel itineraries. | Yes |

---

[42] APHIS initially chose to take no action to prevent licensees who do not exhibit their animals from renewing their licenses. However, in May 2020, APHIS issued regulations to make all exhibitors' licenses non-renewable. Animal Welfare; Amendments to Licensing Provisions and to Requirements for Dogs, 85 Fed. Reg. 28,772 (May 13, 2020). Because the regulation was issued outside the scope of our audit, we did not evaluate the effectiveness of the action.

**Agency's Response**

# APHIS'
# Response to Audit Report



**United States Department of Agriculture** [Agency Logo]

---

United States
Department of
Agriculture

Marketing and
Regulatory
Programs

Washington, DC
20250

**TO:**    Gil H. Harden
Assistant Inspector General
for Audit

**FROM:**  Dr. Mike Watson
Acting Administrator   /S/

**SUBJECT:** Animal and Plant Health Inspection Service (APHIS) Response
and Request for Management Decision on the Office of Inspector
General Report, "Follow-up to Animal and Plant Health Inspection
Service's Controls Over Licensing of Animal Exhibitors"
(33601-03-23)

Thank you for the opportunity for APHIS to comment on this report. APHIS
agrees with all four OIG Recommendations and will take steps discussed below
to implement these Recommendations.

**Recommendation 1: Conduct a study to determine if there continues to be
an issue with public barriers at licensed exhibitors with potentially dangerous
animals. If the results indicate an issue, determine and implement the
necessary corrective actions (i.e., new regulations, training, and/or guidance).**

**APHIS Response:** APHIS agrees with this Recommendation. APHIS will conduct
a barrier study at licensed exhibitors including the 19 facilities that OIG selected as
part of the 2020 audit. The study will include a review of any incidents involving
barriers that have occurred at these facilities. As part of this review, barriers will be
measured for height and distance from primary enclosures and photographed; then
submitted to the Animal Care species specialist team for assessment and evaluation.
Animal Care will complete the barrier study by December 31, 2021.

**Recommendation 2: Consult with OGC to determine if APHIS has the
authority under the AWA to require exhibitors to report animal escapes and/or
attacks to APHIS. If APHIS does have the necessary authority, take action to
ensure exhibitors report animal escapes and/or attacks to APHIS.**

**APHIS Response:** APHIS agrees with this Recommendation. By March 31,
2021, APHIS will contact the USDA Office of General Counsel (OGC) to determine
if APHIS has the authority under the AWA to require reporting of escapes and/or
attacks. If OGC determines that APHIS does have the authority to require reporting,
then, by March 31, 2022, APHIS will develop an action plan to require reporting.
This action plan will be based on OGC recommendations and may include

promulgating regulations and/or stakeholder announcements, letters to licensees, tracking escapes/attacks, and working with facilities to prevent further incidents.

**Recommendation 3:  Document the procedures for canceling a regulatory proposal, including the reason for any removal.**

**APHIS Response:**  APHIS agrees with this Recommendation.  Animal Care's National Policy Staff office will track regulatory proposals, including the reasons for removal.  Animal Care will modify the Regulatory Work Plans Standard Operating Procedures (SOP) to include documenting a regulatory proposal that has been cancelled and the reason for any removal.  Animal Care will modify the SOP by March 31, 2021.

**Recommendation 4:  Develop and implement controls for Animal Care Assistant Directors to monitor adherence to [Risk-Based Inspection System] RBIS frequency to ensure that inspections are conducted in a timely manner.**

**APHIS Response:**  APHIS agrees with this Recommendation.  Animal Care's section of APHIS' eFile database and tracking system will be modified, by April 30, 2021, to allow Animal Care's Assistant Directors to monitor RBIS frequencies to ensure that inspections are conducted in a timely manner.



**Learn more about USDA OIG**
Visit our website: **www.usda.gov/oig/index.htm**
Follow us on Twitter: @OIGUSDA

**How to Report Suspected Wrongdoing in USDA Programs**

**Fraud, Waste, and Abuse**
File complaint online: **www.usda.gov/oig/hotline.htm**

**Monday–Friday, 9:00 a.m.– 3:00 p.m. ET**
In Washington, DC 202-690-1622
Outside DC 800-424-9121
TDD (Call Collect) 202-690-1202

**Bribes or Gratuities**
202-720-7257 (24 hours)

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.