# EXHIBIT W



**U.S. Department of Agriculture**

**Office of Inspector General**



# Animal and Plant Health Inspection Service Animal Care Program Inspections of Problematic Dealers

**Audit Report 33002-4-SF**
**May 2010**



U.S. Department of Agriculture
Office of Inspector General
Washington, D.C. 20250



DATE:       May 14, 2010

REPLY TO
ATTN OF:    33002-4-SF

TO:         Cindy J. Smith
            Administrator
            Animal and Plant Health Inspection Service

ATTN:       Joanne Munno
            Acting Deputy Administrator
            Marketing and Regulatory Programs Business Services

FROM:       Gil H. Harden   /s/
            Assistant Inspector General
              for Audit

SUBJECT:    APHIS Animal Care Program – Inspections of Problematic Dealers


This report presents the results of the subject review.  Your written response to the official draft report is included at the end of the report.  Excerpts from the response and the Office of Inspector General's (OIG) position are incorporated into the relevant sections of the report.  Based on the information in your written response, we have accepted your management decision on Recommendations 1, 2, 3, 5, 6, 7, 8, 9, 10, 12, 13 and 14.  Please follow your internal agency procedures in forwarding final action correspondence to the Office of the Chief Financial Officer.

Based on your written response, management decision has not been reached on Recommendations 4 and 11.  The information needed to reach management decision on these recommendations is set forth in the OIG Position section after each recommendation.  In accordance with Departmental Regulation 1720-1, please furnish a reply within 60 days providing the information requested in the OIG Position section.  Please note that the regulation requires a management decision to be reached on all findings and recommendations within a maximum of 6 months from report issuance, and final action to be taken within 1 year of each management decision.

We appreciate the courtesies and cooperation extended to us by members of your staff during the review.

## Table of Contents

Executive Summary .................................................................................1

Background & Objectives ......................................................................4

  Background ........................................................................................4

  Objectives .........................................................................................7

Section 1:  Enforcement .......................................................................8

  Finding 1:  AC's Enforcement Process Was Ineffective Against
  Problematic Dealers .........................................................................8

    Recommendation 1.....................................................................14

    Recommendation 2.....................................................................15

    Recommendation 3.....................................................................15

    Recommendation 4.....................................................................16

    Recommendation 5.....................................................................16

  Finding 2:  AC Inspectors Did Not Cite or Document Violations
  Properly To Support Enforcement Actions ......................................17

    Recommendation 6.....................................................................23

    Recommendation 7.....................................................................24

Section 2:  Stipulations ......................................................................25

  Finding 3:  APHIS' New Penalty Worksheet Calculated Minimal
  Penalties .........................................................................................25

    Recommendation 8.....................................................................30

    Recommendation 9.....................................................................30

  Finding 4:  APHIS Misused Guidelines to Lower Penalties for AWA
  Violators..........................................................................................30

    Recommendation 10...................................................................34

    Recommendation 11...................................................................35

Section 3:  Internet..............................................................................36

  Finding 5:  Some Large Breeders Circumvented AWA by Selling
  Animals Over the Internet ...............................................................36

    Recommendation 12...................................................................38

**Section 4:  Information System** ...................................................**39**

**Finding 6:  Security Controls Need to Be Addressed for AC's New Information System** ......................................................**39**

   **Recommendation 13**......................................................**40**

**Section 5:  Debt Management** .................................................**41**

**Finding 7:  IES Did Not Adequately Establish Payment Plans for Stipulations** ......................................................**41**

   **Recommendation 14**......................................................**42**

**Scope and Methodology**.............................................................**43**

**Abbreviations** ..............................................................................**46**

**Exhibit A: Summary of Monetary Results**.............................**47**

**Exhibit B: Audit Sites Visited**..................................................**48**

**Exhibit C: Violations Cited at Dealer Facilities in FYs 2006-2008**........**51**

**Exhibit D: Additional Photos Taken During Site Reviews**...................**52**

**Agency's Response** .....................................................................**55**

## Animal Care Program – Inspections of Problematic Dealers

## Executive Summary

In the last 2 years, there has been significant media coverage concerning large-scale dog dealers (i.e., breeders and brokers)[1] that failed to provide humane treatment for the animals under their care. The breeders, negatively referred to as "puppy mills," have stirred the interest of the public, Congress, animal rights groups, and others. Accordingly, we conducted an audit of the Animal and Plant Health Inspection Service's (APHIS) Animal Care (AC) unit, which is responsible for enforcing the Animal Welfare Act (AWA). The audit focused on AC's inspections of problematic dealers. It is the latest in a series of audits related to AWA.[2]

In our last audit on animals in research facilities,[3] we found that the agency was not aggressively pursuing enforcement actions against violators of AWA and that it assessed minimal monetary penalties against them.[4] APHIS agreed to take corrective action by incorporating more specific guidance in its operating manual to address deficiencies in enforcement actions. It also agreed to revise its penalty worksheet to generate higher and more appropriate penalties.

In this audit, one objective was to review AC's enforcement process against dealers that violated AWA. Accordingly, we focused on dealers with a history of violations in the past 3 years.[5] Another objective was to review the impact of recent changes the agency made to the penalty assessment process. We identified the following major deficiencies with APHIS' administration of AWA:

- *AC's Enforcement Process Was Ineffective Against Problematic Dealers.* AC's enforcement process was ineffective in achieving dealer compliance with AWA and regulations, which are intended to ensure the humane care and treatment of animals. The agency believed that compliance achieved through education[6] and cooperation would result in long-term dealer compliance and, accordingly, it chose to take little or no enforcement action against most violators.

  However, the agency's education efforts have not always been successful in deterring problematic dealers from violating AWA. During FYs 2006-2008, at the re-inspection of 4,250 violators, inspectors found that 2,416 repeatedly violated AWA, including some that ignored minimum care standards. Therefore, relying heavily on education for serious or repeat violators—without an appropriate level of enforcement—weakened the agency's ability to protect the animals.

- *AC Inspectors Did Not Cite or Document Violations Properly To Support Enforcement Actions.* Many inspectors were highly committed, conducting timely and thorough

---

[1] Breeders are those that breed and raise animals on the premises; brokers negotiate or arrange for the purchase, sale, or transport of animals in commerce.
[2] Refer to the Background section for more information on related prior audits.
[3] Audit No. 33002-3-SF, "APHIS Animal Care Program Inspection and Enforcement Activities" (September 2005).
[4] AWA refers to monetary penalties as civil penalties.
[5] APHIS synonymously used the terms violations, alleged violations, and noncompliant items in its documents. For simplicity, we used the term violations in this report.
[6] Education was generally provided through the inspectors' interaction with dealers during routine inspections as well as periodic seminars.

inspections and making significant efforts to improve the humane treatment of covered animals. However, we noted that 6 of 19 inspectors[7] did not correctly report all repeat or direct violations (those that are generally more serious and affect the animals' health). Consequently, some problematic dealers were inspected less frequently.

In addition, some inspectors did not always adequately describe violations in their inspection reports or support violations with photos. Between 2000 and 2009, this lack of documentary evidence weakened AC's case in 7 of the 16 administrative hearings involving dealers.[8] In discussing these problems with regional management, they explained that some inspectors appeared to need additional training in identifying violations and collecting evidence.

- *APHIS' New Penalty Worksheet Calculated Minimal Penalties*. Although APHIS previously agreed to revise its penalty worksheet to produce "significantly higher" penalties for violators of AWA, the agency continued to assess minimal penalties that did not deter violators. This occurred because the new worksheet allowed reductions up to 145 percent of the maximum penalty. While we are not advocating that APHIS assess the maximum penalty, we found that at a time when Congress tripled the authorized maximum penalty to "strengthen fines for violations," the actual penalties were 20 percent less using the new worksheet as compared to the worksheet APHIS previously used.

- *APHIS Misused Guidelines to Lower Penalties for AWA Violators*. In completing penalty worksheets, APHIS misused its guidelines in 32 of the 94 cases we reviewed to lower the penalties for AWA violators. Specifically, it (1) inconsistently counted violations; (2) applied "good faith" reductions without merit; (3) allowed a "no history of violations" reduction when the violators had a prior history; and (4) arbitrarily changed the gravity of some violations and the business size. AC told us that it assessed lower penalties as an incentive to encourage violators to pay a stipulated amount rather than exercise their right to a hearing.

- *Some Large Breeders Circumvented AWA by Selling Animals Over the Internet*. Large breeders that sell AWA-covered animals over the Internet are exempt from AC's inspection and licensing requirements due to a loophole in AWA. As a result, an increasing number of these unlicensed breeders are not monitored for their animals' overall health and humane treatment.

### Recommendation Summary

To ensure dealer compliance with AWA, AC should modify its *Dealer Inspection Guide* (Guide) to require enforcement action for direct and serious violations. We also recommend that "no action" be deleted as an enforcement action in the Guide.

---

[7] In 2008, AC employed 99 inspectors. We accompanied 19 on their inspections of dealer facilities.
[8] During this period, administrative law judges or the Department's Judicial Officer rendered decisions in 16 cases involving dealers. We reviewed all 16.

To increase the effectiveness of inspections, AC should provide more comprehensive training and detailed guidance to its inspectors and supervisors on direct and repeat violations, enforcement procedures, and evidentiary requirements (e.g., adequately describing violations).

To calculate more reasonable penalties, APHIS should limit total reductions on its penalty worksheet to less than 100 percent. We also recommend that the agency ensure its penalty guidelines are consistently followed and that it include instructions to count each animal as a separate violation in cases involving animal deaths and unlicensed wholesale activities.

To prevent large breeders from circumventing AWA requirements, APHIS should propose that the Secretary seek legislative change to exclude these breeders from the definition of "retail pet store," and require that all applicable breeders that sell through the Internet be regulated under AWA.

## Agency Response

In its written response, dated April 23, 2010, APHIS concurred with the reported findings and recommendations. APHIS' response is included at the end of this report.

## OIG Position

We accept APHIS' management decision on Recommendations 1, 2, 3, 5, 6, 7, 8, 9, 10, 12, 13 and 14. The actions needed to reach management decision on Recommendations 4 and 11 are provided in the OIG Position section after these recommendations.

## *Background & Objectives*

## Background

In 1966, Congress passed Public Law 89-544, known as the Laboratory Animal Welfare Act, to regulate the humane care and handling of dogs, cats, and other laboratory animals. The law was amended in 1970 (Public Law 91-579), changing the name to AWA. This amendment also authorized the Secretary of Agriculture to regulate other warm-blooded animals when used in research, exhibition, or the wholesale pet trade. Additional amendments to the law were passed in 1976, 1985, 1990, 2002, and 2008—each adding new regulated activities for warm-blooded animals.

APHIS' AC unit enforces AWA based on the policies established by the Secretary. AC is headquartered in Riverdale, Maryland and has regional offices in Raleigh, North Carolina and Fort Collins, Colorado. The agency employs 99 inspectors,[9] who are dispersed throughout the country, to conduct inspections of all licensed and registered facilities covered under AWA and to follow up on complaints of abuse and noncompliance. In FY 2008, the inspectors conducted 15,722 inspections on licensed and registered facilities. In FY 2008, APHIS received an appropriation of $874 million; AC's portion was $21 million, as specified in the Consolidated Appropriations Act.

In the wholesale pet trade, there are two types of licensed dealers: breeders (those that breed and raise animals on the premises) and brokers (those that negotiate or arrange for the purchase, sale, or transport of animals in commerce). In FY 2008, there were 4,604 licensed breeders and 1,116 licensed brokers.

Before AC issues a license, it conducts a pre-licensing inspection because by law applicants must be in full compliance with AWA and regulations. After a license is issued, AC inspectors perform unannounced inspections at least biennially to ensure the facilities remain in compliance with AWA. If an inspector finds AWA violations, the dealer is given anywhere from a day to a year to fix the problems depending on their severity. During our site visits, the inspectors gave the dealers an average of 16 days to correct their violations.

After inspectors are hired, they receive 5-6 weeks initial training on animal care standards and inspections. Thereafter, they receive annual training in the form of national or regional conferences as well as meetings with their supervisors. To ensure the inspectors consistently apply their training, APHIS also developed field standards, i.e., the *Dealer Inspection Guide*. See table 1 for the number of inspections AC conducted during FYs 2006-2008.

---

[9] In FY 2008.

**Table 1: Inspections Conducted in FYs 2006-2008**

|  | 2006 | 2007 | 2008 |
|---|---|---|---|
| No. of Inspectors | 99 | 101 | 99 |
| No. of Inspections* | 17,978 | 16,542 | 15,722 |
| Average Inspections Per Inspector | 182 | 164 | 159 |
| * These numbers include inspections on all licensees (i.e., dealers and exhibitors) and registrants (i.e., research facilities) under AWA. | | | |

Since 1994, AC tracked the inspections through its Licensing and Registration Information System (LARIS). LARIS included a risk-based inspection system, which calculated the minimum number of inspections that were needed annually based on a continual risk assessment of each facility's violation history. However, both our 1995 and 2005 audits found that LARIS generated unreliable and inaccurate information.[10] AC agreed with our conclusions and hired a contractor to develop a new system—Online Animal Care Information System (OACIS). Later, AC determined that the OACIS contractor was not meeting the program's requirements and terminated the contract. APHIS then contracted with another system developer to build the Animal Care Information System, which was implemented in March 2009.

## ENFORCEMENT PROCESS

When a violation is identified during an inspection of a dealer's facility, AWA authorizes AC to take remedial action against the violator by assessing a fine, suspending or revoking the license, or pursuing criminal penalties.[11] Before taking these actions, AC also considers other enforcement options: no action, a letter of information (an informal warning letter), an official warning letter, and an investigation.[12]

Investigations are conducted by APHIS' Investigative and Enforcement Services unit, which carries out enforcement activities and provides support to all APHIS programs. An investigation may result in a stipulation, suspension or revocation of license, or confiscation of animals. A stipulation is an agreement between APHIS and the violator, where the violator can pay a reduced penalty by giving up his right to a formal administrative hearing. APHIS' Financial Management Division in Minneapolis is responsible for collecting the stipulations and monetary penalties.

Cases that warrant formal administrative action undergo Office of the General Counsel review for legal sufficiency prior to issuance of a formal administrative complaint before the U.S. Department of Agriculture's (Department) administrative law judges. If the case is appealed, a final decision is made by the Department's Judicial Officer. Formal actions may result in license suspensions or revocations, cease-and-desist orders, monetary penalties, or combinations of these penalties.

---

[10] OIG Audit No. 33600-1-Ch, "Enforcement of the Animal Welfare Act" (January 1995) and Audit No. 33002-3-SF, "APHIS Animal Care Program Inspection and Enforcement Activities" (September 2005).
[11] 7 *United States Code* (U.S.C.) §2149 (January 3, 2007).
[12] *Dealer Inspection Guide*, ch. 9.3 (May 2002). In 2007, AC discontinued "letter of information" as an enforcement option.

AWA authorizes APHIS to cooperate with the States,[13] all of which have animal cruelty laws. However, although AC established memoranda of understanding with a few States, it did not establish internal procedures to forward animal cruelty and abuse cases to the State officials. Generally, AC regional management relies on the inspectors' discretion to notify State and local officials because the inspectors may have established relationships with these officials. Figure 1 shows which States have first-offense, subsequent-offense, or misdemeanor cruelty laws.



Figure 1: States With Animal Cruelty Laws

40 States have a first-offense felony cruelty law
5 States have a subsequent-offense felony cruelty law
5 States have a misdemeanor cruelty law

**RELATED PRIOR AUDITS**

This audit is the latest in a series of audits related to AC's administration and enforcement of AWA. Three of these audits focused on dealers and research facilities:

In 1992, OIG conducted an audit on animal care and concluded that APHIS could not ensure the humane care and treatment of animals at all dealer facilities as required by AWA.[14] APHIS did not inspect dealer facilities with reliable frequency, and it did not enforce timely correction of violations found during inspections. Moreover, APHIS did not timely penalize facilities found to be in violation of AWA.

In 1995, OIG conducted a follow-up audit and reported that APHIS did not fully address problems disclosed in the prior report.[15] APHIS needed to take stronger enforcement actions to correct serious or repeat violations of AWA. Dealers and other facilities had little incentive to comply with AWA because monetary penalties were, in some cases, arbitrarily reduced and were often so low that violators regarded them as a cost of business.

---

[13] 7 U.S.C. §2145(b) (January 3, 2007).
[14] Audit No. 33002-1-Ch, "APHIS Implementation of the Animal Welfare Act" (March 1992).
[15] Audit No. 33600-1-Ch, "APHIS Enforcement of the Animal Welfare Act" (January 1995).

In 2005, OIG conducted an audit on animals in research facilities and found that the agency was not aggressively pursuing enforcement actions against violators of AWA and that it assessed minimal monetary penalties against them.[16]  Inspectors believed the lack of enforcement action undermined their credibility and authority to enforce AWA.  In addition to giving an automatic 75-percent "discount," APHIS offered other concessions making the fines basically meaningless. Violators considered the monetary stipulation as a normal cost of business rather than a deterrent for violating the law.

## Objectives

Our audit objectives were to (1) evaluate the adequacy of APHIS' controls to ensure dealer compliance with AWA, (2) review the impact of recent changes to the penalty assessment process, and (3) evaluate AC's new mission critical information system for reliability and integrity.  Due to unexpected delays in implementing the new system, we were unable to complete the third objective.

---

[16] Audit No. 33002-3-SF, "APHIS Animal Care Program Inspection and Enforcement Activities" (September 2005).

## *Section 1: Enforcement*

## Finding 1: AC's Enforcement Process Was Ineffective Against Problematic Dealers

During FYs 2006-2008, Animal Care's (AC) enforcement process was ineffective in achieving dealer compliance with the Animal Welfare Act (AWA) and regulations. This occurred because the agency believed that compliance achieved through education and cooperation would result in long-term dealer compliance. Accordingly, the agency chose to take little or no enforcement actions against violators. However, taking this position against serious or repeat violators weakened the agency's ability to protect the animals. As a result, 2,416 of 4,250 violators repeatedly violated AWA, including some that ignored minimum care standards, which are intended to ensure the humane care and treatment of animals.

AWA authorizes APHIS to take remedial action against AWA violators by assessing monetary penalties, suspending or revoking licenses, or pursuing criminal penalties.[17] The *Dealer Inspection Guide* (Guide), AC's field standards, further elaborates on these enforcement actions.

AC administers AWA through the licensing and inspection of dealers (i.e., breeders and brokers). The enforcement process begins when violations[18] are identified during an inspection of a dealer's facility. If AC decides to take enforcement action, it may refer the case to APHIS' Investigative and Enforcement Services (IES) unit. The resulting investigation can lead to a stipulation (an agreement between APHIS and the violator, where the violator can pay a reduced penalty by giving up his right to a formal administrative hearing), suspension or revocation of license, or confiscation of animals. However, AC may elect to take no action or a lesser action, such as a letter of information or an official warning.[19]

During the 3-year period, AC inspected 8,289 licensed dealers and found that 5,261 violated AWA (see exhibit C for the number and types of violations that occurred). At the re-inspection of 4,250 violators,[20] inspectors found that 2,416 repeatedly violated AWA, including 863 that continued to violate the same subsections.

To evaluate the adequacy of AC's controls over dealer compliance with AWA, we reviewed guidelines, management policies, the inspectors' practices, and enforcement actions against AWA violators. We identified four practices that demonstrate AC's leniency towards dealers that violate AWA:

- No Enforcement Action for First-time Violators. Typically, AC does not take enforcement action against first-time violators, even if the inspector identifies a direct violation (i.e., one that has a high potential for adversely affecting the health of an animal). The Guide states that inspectors "**may** recommend an enforcement action" for violations that are direct or serious, although the Guide does not define serious.[21] Based

---

[17] 7 U.S.C. §2149 (January 3, 2007).
[18] APHIS synonymously used the terms violations, alleged violations, and noncompliant items in its documents. For simplicity, we used the term violations in this report.
[19] *Dealer Inspection Guide*, ch. 9.3 (May 2002). In 2007, AC discontinued "letter of information" as an enforcement option.
[20] AC did not re-inspect 1,011 violators because some were not scheduled for re-inspection until FY 2009, while others were no longer licensed.
[21] *Dealer Inspection Guide*, ch. 9.3 (May 2002).

on our observations and analysis, since inspectors were given the choice of not recommending an action, generally they did not.

- Inadequate Enforcement for Repeat Violators. The Guide states that inspectors "**must** recommend an enforcement action" for repeat violators; however, one of the choices is to take no action,[22] which is what the inspectors did in 52 percent of the repeat violations we reviewed.

  Also, AC narrowly defines a repeat violator as one that consecutively violates the same subsection of the animal welfare regulations. This means that on successive inspections a dealer can violate different sections of the regulations without being labeled a repeat violator and, therefore, the inspector is not required to recommend an enforcement action.

- Written Instructions Not Always Followed. In 2007, the national office provided instructions entitled, "Animal Care Enforcement Action Guidance for Inspection Reports," to aid its inspectors in selecting enforcement actions. These instructions were never incorporated in AC's Guide and, therefore, supervisors and regional management did not always ensure that the inspectors followed them. When instructions specified a stronger action, such as a stipulation or litigation, the inspectors were allowed to recommend a more lenient option.

- Delayed Confiscation. AWA allows APHIS to confiscate any animal found to be suffering as a result of a failure to comply with AWA.[23] APHIS added a provision requiring that the violator be given a final opportunity to take corrective action before confiscation can occur,[24] even in extreme cases where animals are dying or suffering.[25]

To evaluate the effect of these practices, we selected 8 States and visited 50 breeders and 18 brokers (68 in total) that had been cited for at least one violation in their previous 3-year inspection history.[26] AC generally took little or no enforcement actions against these facilities during the period (see chart 1).

---

[22] *Dealer Inspection Guide*, ch. 9.3 (May 2002).
[23] 7 U.S.C. § 2146(a) (January 3, 2007).
[24] 9 *Code of Federal Regulations* (CFR) §2.129(a) (January 1, 2005) and *Dealer Inspection Guide*, ch. 8.6.1 (April 2000).
[25] AC defines suffering as "any condition that causes pain or distress . . . Examples [include]: animals with serious medical problems that are not receiving adequate veterinary care; animals without adequate food or water; animals exposed to temperature extremes without adequate shelter or bedding; and animals held in enclosures that are filthy. Animals do not need to be in jeopardy of dying to be in a state of suffering." AC Policy No. 8 (May 8, 2001).
[26] We visited a total of 81 dealers in 8 States but 13 had no history of violations and, therefore, were not part of our sample for determining the effectiveness of AC's enforcement process.



The agency believed that compliance achieved through education and cooperation would result in long-term dealer compliance. Education was generally provided through the inspectors' interaction with dealers during routine inspections as well as periodic seminars. While we agree that teaching dealers the skills to properly care for their animals should improve the animals' health and wellbeing, the quality of the education depends on the inspectors' experience and skills. Also, the seminars were not mandated but attended voluntarily. One inspector told us the dealers that attended the canine care classes were often not the ones that needed them.

Expecting that the dealers would improve their standards of care, the agency chose to take little or no enforcement actions against most violators. However, education efforts have not always been successful in deterring problematic dealers from violating AWA. Although AC might decide on little or no actions when circumstances warrant, taking this position against serious or repeat violators weakened the agency's ability to ensure compliance with AWA.

During our visits, AC cited 20 of the 68 dealers for repeat violations (nearly 30 percent). The following examples demonstrate the agency's leniency towards violators, the ineffectiveness of its enforcement process, and the harmful effect they had on the animals. All of the examples below involve dealers that had a history of violations over at least three inspections before our visit. However, the agency took little or no enforcement actions against them. During our visit, we found 12 dealers (18 percent) with violations that had escalated to the serious or grave levels, which directly affected the animals' health. If AC had taken action earlier, it may have prevented the situation from worsening.

**Example 1:** At a facility in Oklahoma with 83 adult dogs, AC cited the breeder for a total of 20 violations (including 1 repeat and 1 direct) during 5 inspections from April 2006 to December 2007. The direct violation concerned the lack of adequate veterinary care for three dogs with

hair loss over their entire bodies and raw, irritated spots on their skin.[27]  Despite the continuing violations, AC did not take enforcement actions due to its lenient practices against repeat violators.

During our visit to the facility in July 2008, AC cited the breeder for another 11 violations (including 1 repeat and 3 directs).  One of the direct violations involved a dog that had been bitten by another dog.  The first dog was left untreated for at least 7 days, which resulted in the flesh around the wound rotting away to the bone (see figure 2).

**Figure 2: Live Dog With Mutilated Leg**



The breeder admitted the dog had been in this condition for at least 7 days.  The inspector correctly required the dog to be taken to a local veterinarian who immediately euthanized it.

AC did refer the case to IES for investigation, but only after another direct violation was documented in a subsequent inspection after our visit.  Based on the results of the investigation, AC recommended a stipulation.  However, as of early June 2009—11 months after our visit—the violator had not yet been fined.[28]

Also, although AWA states that "the Secretary is authorized to cooperate with the officials of the various States . . . in carrying out the purpose of [AWA],"[29] AC did not establish procedures to forward animal cruelty cases to these officials.  In this case, AC did not notify the State of Oklahoma (which has first-offense felony laws for animal cruelty) of the inhumane treatment the dog received.

---

[27] After the direct violation was cited in December 2007, the inspector re-inspected the facility in January 2008 and found that the attending veterinarian prescribed treatment for the dogs.
[28] For stipulation cases closed between October 2006 and April 2008, it took IES an average of 10 months to issue a stipulation.
[29] 7 U.S.C. §2145(b) (January 3, 2007).

**Example 2**: At another facility in Oklahoma with 96 adult dogs, AC cited the breeder for 23 violations (including 12 repeats) during 4 inspections from August 2005 to September 2007. Although national office instructions state, "if compliance [is] not attained quickly, proceed to other enforcement steps," AC could not explain why it took no enforcement action.[30]

During our visit to the facility in July 2008, AC cited the breeder for another 11 violations (including 1 repeat). We found numerous dogs infested with ticks. In one case, the ticks completely covered the dog's body (see figure 3). The dog appeared extremely tired and stressed and did not move, even when we approached it.

**Figure 3: Dog with Excessive Ticks**



The inspector required the breeder to take only eight of the numerous infested dogs to a veterinarian.[31] However, since the inspector did not identify the dogs in the inspection report, it is uncertain if this dog was treated.

Although the inspector was concerned that the dogs might be anemic, she cited the ticks as an indirect violation (i.e., not affecting the animal's health).[32] AC referred the case to IES for investigation. As of early June 2009—11 months after our visit—the case was still under investigation.

**Example 3**: At a facility in Ohio with 88 adult dogs, AC cited the breeder for 23 violations (including 7 repeats) during 3 inspections from August 2005 to January 2008. In July 2007, AC sent an official warning to correct the identified care and cleanliness violations or face a "more severe penalty." In January 2008, AC found the same violations but, instead of imposing a more severe penalty, sent another official warning.

---

[30] *Animal Care Enforcement Action Guidance for Inspection Reports* distributed to AC staff in 2007.
[31] According to APHIS, the inspector documented and photographed the violation for enforcement action. However, we did not observe her taking any photos when we were there, and afterwards she could not produce them.
[32] See Finding 2 for additional information about indirect and direct violations.

National instructions state that an official warning can be sent if no other enforcement action was taken against the violator in the previous 3 years.[33]   In this case, the violator had received an official warning 7 months before so a more serious action was warranted.  When we asked AC why a more serious action was not taken, regional management told us that the breeder was making progress.  Consequently, national instructions were not followed in order to give the breeder "a reasonable opportunity" to comply with AWA.

Four months later, during our visit to the facility in June 2008, AC cited the breeder for another 9 violations (including 4 repeats).  For example, a large amount of feces and urine was pooled under the kennels producing an overpowering odor (see figure 4). The inspector recommended no enforcement action.

**Figure 4: Deep Pool of Feces and Urine Under Occupied Kennel**



The breeder was cited for cleaning and sanitation violations during this inspection.

Four months later, the breeder was re-inspected and cited for 4 more violations (including 3 repeats).  Again, AC took no enforcement action because the violator was "making credible progress," as noted in AC's "Enforcement Action Option Worksheet."

**Example 4:** At a facility in Oklahoma with 219 adult dogs, AC cited the breeder for 29 violations (including 9 repeats) during 3 inspections from February 2006 to January 2007.[34] AC requested an IES investigation in May 2007.  However, before the investigation resulted in any enforcement action, the inspector conducted another inspection in November 2007 and found five dead dogs and other starving dogs that had resorted to cannibalism.  Despite these conditions, AC did not immediately confiscate the surviving dogs and, as a result, 22 additional dogs died before the breeder's license was revoked.

---

[33] *Animal Care Enforcement Action Guidance for Inspection Reports* distributed to AC staff in 2007.
[34] The facility was on our original sample list.  However, we did not visit it because its license was revoked before our fieldwork.  We performed a file review instead.

AWA states, "the Secretary shall promulgate . . . regulations . . . to permit inspectors to confiscate or destroy in a humane manner any animal found to be suffering as a result of a failure to comply with any provision of the [AWA]."[35]  We asked why the dogs were not confiscated when the inspector first found the dead and starving dogs.  AC responded that its regulations require that the violator be given an opportunity to correct the condition before any confiscation can occur.[36]

In the end, the breeder's license was revoked and the surviving dogs were placed in new homes within a year.  However, our concern was that AC should have confiscated the dogs instead of giving the breeder another opportunity to correct the condition.  If AC had the regulatory authority to immediately confiscate any animals in extreme cases such as this, some of the 22 additional dogs may have survived.

In summary, according to AC's Guide, the goal of the agency's enforcement is to gain dealer compliance with AWA.  However, some of AC's practices weaken its ability to accomplish this.  Specifically, AC generally does not take enforcement action until a dealer is cited for repeat violations, which are narrowly defined.  The Guide also lists "no action" as an enforcement action, which it is not.  While taking no action may be reasonable at times, national guidance does require stronger enforcement actions in more serious situations.  However, AC staff did not always follow the guidance and, consequently, many dealers were undeterred from continuing to violate AWA.  See exhibit D for more examples of dealer noncompliance with AWA.

To ensure that animals covered by AWA receive humane care and treatment, the agency should require an enforcement action for direct and serious violations; remove "no action" as an enforcement action; and establish controls to ensure inspectors and their supervisors follow national enforcement action guidance in selecting the appropriate option.  Also, the agency should modify its regulations to allow immediate confiscation of suffering animals.  Last, in States that have felony laws for animal cruelty, the agency should establish procedures to refer such cases to State government.

### Recommendation 1

Modify the *Dealer Inspection Guide* to require an enforcement action for direct and serious violations.  Also, define a serious violation in the Guide.

### Agency Response

APHIS agrees with this Recommendation.  We will provide  AC employees with guidance regarding all enforcement action options including direct and serious Non-Compliant Items (NCIs)[37] drawn from OIG recommendations, Office of the General Counsel guidance, and legal decisions.  APHIS will incorporate the requirements in a new document entitled "Inspection Requirements."  This document will be distributed to and discussed with AC employees during the AC National Meeting, April 19-22, 2010.  APHIS will update the *Dealer Inspection Guide* to include the information in the "Inspection Requirements"

---

[35] 7 U.S.C. § 2146(a) (January 3, 2007).
[36] 9 CFR §2.129(a) (January 1, 2005).
[37] i.e., violations.

document and consolidate it with the *Research Facility Inspection Guide* and the *Exhibitor Inspection Guide* into one comprehensive document.  APHIS anticipates completing the document consolidation by September 30, 2010.

## OIG Position

We accept APHIS' management decision on this recommendation.

## Recommendation 2

Remove "no action" as an enforcement action in the *Dealer Inspection Guide*.

### Agency Response

APHIS agrees with this Recommendation.  We changed the title of the "Enforcement Action Worksheet" to "Enforcement Action Option Worksheet" and changed the flow chart title to read "Enforcement Actions (EA) Guidance for Inspection Reports."  We modified these to clarify that:  (1) inspectors will forward to AC management a recommended EA (they believe will be most effective in attaining compliance) for all repeats and directs and any facility with inspection results that cause it to go from a lower frequency to High Inspection Frequency; and (2) taking no immediate action requires Regional Director approval and a 90-day reinspection to determine if compliance was achieved or if EA is necessary.  Copies of the modified worksheet and flow chart are attached.  AC will retain copies of all EA sheets in the facility files in accordance with records retention guidelines.  AC's supervisors verbally directed their employees to utilize the modified EA worksheet beginning on December 1, 2009.  In addition, this will be reemphasized at the National Meeting.

## OIG Position

We accept APHIS' management decision on this recommendation.

## Recommendation 3

Incorporate instructions provided in the "Animal Care Enforcement Actions Guidance for Inspection Reports" into the *Dealer Inspection Guide* to ensure inspectors and their supervisors follow them in selecting the appropriate enforcement.

### Agency Response

APHIS agrees with this Recommendation.  We will provide AC employees with guidance regarding all EA options to recommend to AC management drawn from OIG recommendations, OGC guidance, and legal decisions.  AC will incorporate the requirements in a new document entitled "Inspection Requirements."  This document will be distributed and covered for AC employees during AC's National Meeting, April 19-22, 2010.  APHIS will update the *Dealer Inspection Guide* to include the information in the "Inspection Requirements" document and consolidate it with the *Research Facility Inspection Guide* and the *Exhibitor Inspection Guide* into one comprehensive document.  APHIS anticipates completing the document consolidation by September 30, 2010.

## OIG Position

We accept APHIS' management decision on this recommendation.

## Recommendation 4

Modify regulations to allow immediate confiscation where animals are dying or seriously suffering.

## Agency Response

APHIS agrees with the intent of this Recommendation, but believes that current regulations are sufficient to allow immediate confiscation. We believe that we can effect the intent of the Recommendation by reviewing and clarifying the confiscation processes so that confiscations can be accomplished with maximum speed and effectiveness. We will distribute the clarified guidance to employees during AC's National Meeting, April 19-22, 2010.

## OIG Position

We agree with APHIS' corrective action. However, since APHIS' planned action differs from OIG's recommendation, to achieve management decision APHIS needs to provide us with a copy of the clarified guidance on confiscation processes to demonstrate how it will effect the intent of the recommendation.

## Recommendation 5

Establish written procedures to refer animal cruelty cases to the States that have such felony laws.

## Agency Response

APHIS agrees with this Recommendation. While AWA does not give APHIS the authority to determine if State or local animal cruelty laws have been violated, we do believe that we should work with State and local authorities in our shared goal of eliminating animal cruelty. APHIS will refer issues of mutual interest to appropriate local authorities who enforce State laws and share inspection reports and EAs with several States that have State-level enforcement capability (e.g., Colorado, Iowa, Kansas, Missouri, and Pennsylvania). AC has modified the regional "Enforcement Action Option Worksheet" to include a check box for inspectors to indicate whether or not they contacted local or State authorities. A copy of the modified worksheet is attached. We will reemphasize with inspectors the need to notify appropriate authorities who enforce State humane laws during AC's National Meeting, April 19-22, 2010. APHIS will develop a Standard Operating Procedure to refer suspected animal cruelty incidents to appropriate authorities that have felony laws for animal cruelty. This document will be completed by September 30, 2010.

## OIG Position

We accept APHIS' management decision on this recommendation.

## Finding 2:  AC Inspectors Did Not Cite or Document Violations Properly To Support Enforcement Actions

During their inspections of dealers, 6 of 19 inspectors did not correctly report all direct or repeat violations, which are generally more serious and require more frequent inspections.  In addition, they did not always adequately describe violations in their inspection reports or support violations with photos.  Although inspectors are allowed to use their judgment when the Guide does not give detailed instructions, some inspectors made poor decisions.  In these cases, AC regional management told us that the inspectors may need additional training in identifying violations and collecting evidence.  As a result, problematic dealers were re-inspected less frequently, which placed their animals at a higher risk for neglect or ill-treatment.[38]  Also, between 2000 and 2009, the lack of documentary evidence weakened AC's case in 7 of the 16 administrative hearings decided during the period.

AC's Guide states that its purpose is to "provide APHIS Animal Care personnel with a clear, concise, user-friendly reference for inspecting the facilities of USDA licensed animal dealers.  By facilitating the inspection process, the Guide will serve as a useful tool to improve the quality and uniformity of inspections, documentation, and enforcement of the Animal Care Program."  However, the Guide does allow inspectors to use their judgment in the decision-making process.[39]

We accompanied 19 of the 99 inspectors to observe their inspections of dealer facilities.  While many inspectors are highly committed, conducting timely and thorough inspections and making significant efforts to improve the humane treatment of covered animals, we noted that six inspectors did not correctly report direct or repeat violations.  Also, the inspectors did not always document violations with sufficient evidence.

**DIRECT VIOLATIONS WERE NOT REPORTED CORRECTLY**

The Guide defines a direct violation as one that "has a high potential to adversely affect the health and well-being of the animal."[40]  These include: "infestation with large numbers of ticks, fleas, or other parasites" and "excessive accumulations of fecal or other waste material to the point where odors, disease hazards, or pest control problems exist."  In such cases, the inspector must re-inspect the facility within 45 days to ensure that the violator has taken timely actions to treat the suffering animals.

In contrast, an indirect violation is one that "does not have a high potential to adversely affect the health and well-being of the animal."[41]  These minor violations include: "inadequate records" and "surfaces not [resistant] to moisture."  In such cases, a re-inspection may not occur for up to a year.

---

[38] AC uses a risk-based inspection system to determine frequency of inspections.  If a dealer is not cited for direct or repeat violations, it decreases the frequency of his inspections.
[39] *Dealer Inspection Guide*, ch. 1.2.1 (March 1999).
[40] *Dealer Inspection Guide*, ch. 7.6.1 (April 2000).
[41] *Dealer Inspection Guide*, ch. 7.6.1 (April 2000).

We found that 4 of the 19 inspectors incorrectly reported at least one direct violation as an indirect. After reviewing some of the examples, AC regional management responded that the inspectors may need additional training in identifying violations. Examples follow:

**Example 1:** At a breeder facility in Oklahoma with 96 adult dogs, we observed numerous dogs infested with ticks. One dog's face was covered with ticks (see figure 5).[42]

**Figure 5: Dog Covered with Feeding Ticks**



The inspector required the breeder to take only eight of the infested dogs to a veterinarian. However, she did not identify the dogs in the inspection report or require documentation of the treatment. Therefore, we were not able to determine what happened to this dog.

The inspector reported the ticks as an indirect violation, even though excessive ticks are classified as a direct violation in AC's Guide.[43] The inspector told us that "without doing a physical exam on the dogs, it would be hard to tell exactly how detrimental the ticks were." Even so, she reported that some of the dogs "have enough ticks to be concerned about their hematocrit [a red blood cell ratio indicating anemic conditions]."

When we showed figure 5 to a senior veterinarian at AC's national office and the western regional director, they disagreed with the inspector's judgment of the violation. Both stated that it should have been reported as a direct violation in the inspection report.

Several months later, we asked for the treatment records to determine if the tick-infested dogs had received appropriate care, since AC's policy states that "every facility is expected to have a system of health records sufficiently comprehensive to demonstrate the delivery of adequate

---

[42] See figure 3 in finding 1 for another dog in this facility with ticks completely covering the dog's body.
[43] *Dealer Inspection Guide*, ch. 7.6.1 (April 2000).

health care . . . [including] dates and other details of all treatments."[44]  The inspector told us she could not require the records because AC "cannot enforce policy" and current regulations do not require breeders to keep them.

We found that although AWA and AC regulations are silent on treatment records, they do require adequate veterinary care;[45] without these records, the inspector cannot determine if a violator corrected the problem.  We also noted that this inspector had required such records at other facilities, as did other inspectors we travelled with.

Last, the inspector did not identify the specific animals in her inspection report.  According to APHIS, the inspector documented and photographed the violation for enforcement action.  However, we did not observe her taking any photos when we were there and she could not subsequently produce them.  Without the documentation, it would be impossible to identify the animals during re-inspection to determine if they were treated or just disposed of.

**Example 2:**  At a broker facility in Oklahoma with 525 adult dogs, we observed and the inspector reported "an excessive number of insects/ cockroaches" crawling on walls, the floor, and the ceiling.  Food bowls were also infested with dead and live cockroaches (see figure 6).

**Figure 6: Cockroach-Infested Food**



The inspector required the broker to correct the contaminated food within 5 days.  However, by not designating this as a direct violation, the inspector will not know if the correction occurred since she will not return for a re-inspection for a year.

The inspector cited the violation as an indirect, even though contaminated feed and heavy vermin infestation in storage or feeding area are classified as direct violations in the Guide.[46]  She told us that "cockroaches in the feed [do not necessarily pose] immediate health concerns . . . animals

---

[44] AC Policy No. 3 (July 17, 2007).
[45] 7 U.S.C §2143(a) (January 3, 2007) and 9 CFR §2.40 (January 1, 2005).
[46] *Dealer Inspection Guide*, ch. 7.6.1 (April 2000).

can eat cockroaches and other bugs with no harm observed to their health." The inspector's supervisor supported the inspector's assessment.

We contacted the directors of the Shelter Medicine Programs at three veterinary schools in California, Massachusetts, and New York to determine if the above situation constituted a direct violation.[47] All three directors disagreed with AC's conclusion. The director of the Shelter Medicine Program at the University of California at Davis told us that "cockroaches have been linked to transmission of [parvovirus and] Salmonella and could be a physical . . . carrier of the disease. While it might not be harmful for the animals to eat a bug on occasion, having such a number of cockroaches in a food container (and in the environment generally) would potentially spread serious diseases . . . constituting a threat not only for animals but also for humans."

The AC supervisor told us that if several inspectors evaluated the same situation, some would document the violation as a direct and others would not. This demonstrates AC's lack of standardization on how animals and violators are treated. To ensure that inspectors cite direct violations consistently, AC should provide more detailed guidance on direct violations and provide more training to the inspectors in identifying them.

**Example 3:** At a breeder facility in Arkansas with about 100 adult dogs, we observed an excessive accumulation of fecal or other waste material in the drainage between two animal enclosures with overpowering odor (see figure 7).

The inspector did not cite this as a violation—either direct or indirect—even though excessive accumulations of fecal or other waste material are classified as a direct violation in the Guide.[48] He told us that the build-up of waste was outdoors and "although the build-up in the drain was unsightly and odorous, there was no evidence that it was affecting the animals adversely." The inspector's supervisor agreed with the citation.

The director of the Shelter Medicine Program at the University of California at Davis told us that "dogs' feces carry bacteria, protozoa and parasites that can constitute a threat to dogs and humans. This is especially true if the feces are allowed to remain in the environment for greater than 12-24 hours, allowing harmful infectious agents to mature to the point that they can be spread (e.g., coccidia, which can cause severe disease in puppies)." The director also stated that it could be worse outdoors because "diseases are more likely to be spread through insects in an outdoor environment."

---

[47] Shelter Medicine Programs advise and educate animal shelters, which are similar to kennels since they care for large numbers of animals in an enclosure, on the proper handling and care of the animals.
[48] *Dealer Inspection Guide*, ch. 7.6.1 (April 2000).

**Figure 7: Excessive Accumulation of Feces and Urine**



The inspector cited the breeder for failure to clean and sanitize the kennel, although this area was not included in the citation. Because the breeder was not cited for any direct violations, the inspector will not return for a re-inspection for a year.

In conclusion, by incorrectly reporting direct violations as indirects, AC re-inspected the violators less frequently, leaving the animals at a higher risk for neglect, illness, and ill-treatment.

**REPEAT VIOLATIONS WERE NOT REPORTED CORRECTLY**

The Guide defines a repeat violation as "a noncompliance cited on the previous inspection or previous consecutive inspections, which has not been corrected, and/or a new noncompliance of the same . . . subsection cited [in] the previous inspection."[49] We found that 4 of the 19 inspectors did not follow the Guide in reporting repeat violations.[50]

**Example 4**:  At a facility in Oklahoma with 55 adult dogs, an inspector cited the breeder for 21 violations during 4 inspections from October 2005 to June 2008.  One inspection identified a

---

[49] *Dealer Inspection Guide,* ch.7.3 (April 2000).
[50] Two of the inspectors were among the four that did not correctly cite direct violations.

violation involving broken wires in pens that needed repair. The next inspection identified sagging wire flooring that needed repair. While both violations fell under the same regulatory subsection[51]—unsafe structures in primary enclosures—the inspector did not report the second as a repeat because the violations were not exactly the same.

We asked the regional directors to comment on what constitutes a repeat violation. The western regional director confirmed that violations with the same citation should be considered repeats. He also stated if the inspectors do not properly identify repeat violations, then they may need more training. The eastern regional director added that in some cases the inspectors need to use their judgment because some subsections are very broad and require interpretation. In this example, however, we believe the citations were very similar and did not require interpretation.

AC requires that enforcement actions be taken against repeat violators. By failing to correctly report a repeat violation, enforcement action may be delayed and future inspections may be less frequent.

## VIOLATIONS WERE NOT SUFFICIENTLY DOCUMENTED

In our evaluation of the enforcement process, we reviewed all administrative hearings related to licensed dealers between 2000 and 2009. We found that in 7 of the 16 decisions, the administrative law judges (ALJ) or the Department's Judicial Officer (JO) dismissed part of the violations because of insufficient evidence, including inadequate description of the violation, lack of photo evidence, etc. In one case, the ALJ stated that APHIS "failed to prove the significant majority of the violations." As a result, the ALJ reduced the violator's fine from $25,000 to $2,500.[52] (See finding 3 for additional discussion on this case and others.)

We reviewed the inspection reports for our sampled facilities and found that the 19 inspectors did not always document their inspections with sufficient evidence, as discussed below.

**Example 5:** We found that photos were not always taken when necessary, even though APHIS issues digital cameras to the inspectors as part of their field equipment. The Guide states that photos should be taken when a violation may result in an enforcement action (or case).[53] Therefore, the inspectors only took photos, although not always, when their inspections identified a repeat or direct violation since it is these violations that may result in an immediate enforcement action.

However, even first violations may eventually be used to support an enforcement action and should be supported with photos, whenever possible. For example, if a direct violation results in an ALJ case, AWA allows that all prior violations (including non-repeat and indirect) be considered in the calculation of a penalty. Most likely, these non-repeat or indirect violations were not photographed and may not be sufficiently supported to be included in the case. In an

---

[51] 9 CFR §3.6 titled "Primary enclosures, General requirements" (January 1, 2005).
[52] *Karen Schmidt*, AWA Docket No. 03-0024.
[53] The Guide does not require photos to be taken for *all* violations. This lack of evidence may weaken APHIS' cases in future hearings.

ALJ decision dated March 7, 2006, the ALJ dismissed six violations in part because there was a lack of photo evidence.[54]

**Example 6:**  We found some inspectors did not adequately describe some violations in inspection reports.  At one facility in Oklahoma, the inspector cited the breeder for inadequate floor space.  Although her report stated "several dogs are kept in kennels that are not large enough to satisfy their space requirements," the inspector provided no further details.  This lack of documentation may impact future litigation.  In a prior ALJ case, when the Department similarly charged another breeder, the ALJ ruled in favor of the breeder stating "without any documentation as to the size of the shelters in the pen, a determination as to their adequacy cannot be made."[55]

In summary, the issues and examples discussed above seriously impacted APHIS' ability to enforce AWA.  Using their own judgment, some inspectors did not always report direct or repeat violations correctly according to the Guide and did not always document violations with sufficient evidence.  When we discussed this issue with the agency, both the deputy administrator and the western regional director generally agreed that the inspectors should be provided more training.  In particular, the deputy administrator suggested additional training in shelter medicine and animal abuse.

To correct these deficiencies, we agree that APHIS should provide more comprehensive training and detailed guidance to its inspectors and supervisors on direct and repeat violations, enforcement procedures, evidentiary requirements (e.g., adequately describing violations), shelter medicine, and animal abuse.  Also, the agency should revise the Guide to require photos for all violations that can be documented in this manner.

### Recommendation 6

Provide more comprehensive training and detailed guidance to the inspectors and supervisors on direct and repeat violations, enforcement procedures, evidentiary requirements (e.g., adequately describing violations), shelter medicine, and animal abuse.

### Agency Response

APHIS agrees with this Recommendation.  We have provided training for all inspectors on identifying direct and repeat NCIs and adequately describing NCIs, during fall 2009 meetings between supervisors and their inspector teams.  We will provide additional training and guidance (i.e., the "Inspection Requirements" document) to AC's inspectors and supervisors on identifying direct and repeat NCIs, adequately describing NCIs, enforcement procedures, and common medical conditions seen at commercial kennels during AC's National Meeting, April 19-22, 2010.  In addition, we will provide a training session on shelter medicine at the National Meeting.  We will develop a comprehensive technical training plan through the Center for Animal Welfare by November 30, 2010.

---

[54] *Karen Schmidt*, AWA Docket No. 03-0024.
[55] *Karen Schmidt*, AWA Docket No. 03-0024.

**OIG Position**

We accept APHIS' management decision on this recommendation.

**Recommendation 7**

Revise the *Dealer Inspection Guide* to require photos for all violations that can be documented in this manner.

**Agency Response**

APHIS agrees with this Recommendation. Our current guidance calls for photographs of: direct NCIs; repeat NCIs; NCIs that may result in EA or an investigation; NCIs that are additional information for ongoing investigations; and transportation violations. In addition, our guidance states that inspectors may choose to take photographs in other circumstances. We will modify our guidance to add NCIs documented on the third prelicense inspection and NCIs documented on inspections that may be appealed. We will reemphasize with inspectors when to take photographs. We will incorporate this information in the new "Inspection Requirements" document, and distribute it to employees during the AC National Meeting, April 19-22, 2010. APHIS will update the *Dealer Inspection Guide* to include the information in the "Inspection Requirements" document and consolidate it with the *Research Facility Inspection Guide* and the *Exhibitor Inspection Guide* into one comprehensive document. APHIS anticipates completing the document consolidation by September 30, 2010.

**OIG Position**

We accept APHIS' management decision on this recommendation.

## Section 2:  Stipulations

## Finding 3:  APHIS' New Penalty Worksheet Calculated Minimal Penalties

Although APHIS previously agreed to revise its penalty worksheet to produce "significantly higher" penalties for violators of AWA, the agency continued to assess minimal penalties for the majority of its stipulation cases.  This occurred because the new worksheet allowed reductions up to 145 percent of the maximum penalty.  As a result, APHIS continued to assess monetary penalties that were inadequate to deter violators.  For the 94 stipulation cases we reviewed, APHIS imposed penalties totaling $348,994, nearly 20 percent less than the $434,078 calculated using the old worksheet.

Congress authorized APHIS to enforce AWA and assess monetary penalties to "any dealer, exhibitor, research facility . . . that violates any provision of this chapter, or any rule, regulation or standard promulgated by the Secretary."[56]  For our sample cases, the maximum penalty ranged from $2,750 to $3,750.

IES, in conjunction with AC, developed a worksheet to calculate penalties for violators.  The overall goal for this worksheet was "to discourage dealers [and others] from violating the Act."[57]  In our prior audit report, we found that IES reduced the amount of the penalties for several factors (e.g., gravity of violations, size of business, etc.) authorized by AWA.[58]  After making these adjustments, IES further reduced the penalties by 75 percent, an automatic reduction applied universally to all penalties, as an incentive for violators to pay the stipulation and thereby forego a hearing.  However, this lowered penalties to such an extent that violators considered them a normal cost of business.  We concluded that the resulting penalties were ineffective deterrents and APHIS agreed to develop a new penalty worksheet.

In April 2006, APHIS implemented a revised worksheet with two significant changes:  adding a "good faith" factor[59] and changing the automatic reduction from 75 to 50 percent, as shown in figure 8.

During the management decision process,[60] APHIS officials explained that "the new [worksheet] results in significantly higher stipulations than have previously been issued for similar violations.  This has not only been seen in current cases, but also in a number of previous cases that the team used to Beta-test the new penalty [worksheet]."[61]  They provided two sample cases, which corroborated their explanation.[62]

---

[56] 7 U.S.C. §2149(a) and 2149(b) (January 1, 2007).
[57] "Determining Penalties under the Animal Welfare Act," pg. 2 (April 2006).
[58] OIG Audit No. 33002-3-SF, "APHIS Animal Care Program Inspection and Enforcement Activities" (September 2005).
[59] Authorized by 7 U.S.C. §2149(b) (January 1, 2007).  AC defines good faith as "compliance with standards of decency and honesty" and "sincere integrity in profession and performance."  For purposes of AWA, a person who shows good faith "may be: willing to comply and correct violations; have animals that are in good health that do not suffer as a result of the violations, and; cooperative with IES and AC."
[60] Management decision is the agency's evaluation of the findings, recommendations, and monetary results in an audit report and its issuance of a proposed decision in response to such findings and recommendations, including any corrective actions determined to be necessary.
[61] Memorandum dated September 21, 2006.
[62] During this audit, we asked APHIS for the entire sample. The agency was unable to provide this information.

**Figure 8: New Worksheet with Good Faith and Automatic 50-percent Penalty Reduction**

| Animal Care Penalty Worksheet | | | | | |
|---|---|---|---|---|---|
| For Violations that *Occurred After* June 1, 2005 | | | | | |
| Maximum Penalty | | | Total Violations | | Maximum Penalty Violations |
| $3,750 | | | 8 | | $30,000 |
| Gravity of Violations | | | | | |
| Minor (50%) | Significant (35%) | Serious (20%) | | Grave (0%) | |
| 0 | 8 | 0 | | 0 | |
| 0 | $10,500 | 0 | | 0 | $10,500 |
| Size of Business | | | | | |
| | Small (20%) | Medium (10%) | | Large (0%) | |
| | $6,000 | $3,000 | | 0 | |
| | | | | | $3,000 |
| Prior History of Violations | | | | | |
| (Letter of Warning, Stipulation, Consent Decision, Admin. Decision) | | | | | |
| | No (25%) | | Yes (0%) | | |
| | $7,500 | | 0 | | |
| | | | | | 7,500 |
| Good Faith | | | | | |
| Good Faith (50%) | No Evidence (25%) | | Lack of Good Faith (0%) | | |
| $15,000 | $7,500 | | 0 | | $7,500 |
| Total Penalty Amount | | | | | |
| | | Agency Recommendation to OGC: | | | $1,500 |
| (No less than $200) | | Agency Stipulation Recommendation: | | | $750 |

## NEW WORKSHEET REDUCED PENALTIES

To review the impact of APHIS' changes to the penalty assessment process since our last audit, we compared the penalties using both the old and the new worksheets for all 94 stipulation cases closed between October 2006 and April 2008.[63]  We found:

- In 53 cases, the penalties were lower using the new worksheet than they would have been using the old worksheet (see chart 2); in 6 other cases, the penalties were the same.

- In 12 of the 53 cases, the reductions decreased the penalties to such an extent (up to 145 percent of the maximum penalty) that they initially resulted in a *negative* number.  In these cases, APHIS arbitrarily changed and inconsistently applied minimum penalties.

The stipulations assessed by APHIS between October 2006 and April 2008 totaled $348,994. We recalculated the penalties with the old worksheet and found that the stipulations would have been $434,078.  Instead of assessing "significantly higher stipulations," APHIS *lowered* the violators' penalties by $85,084—a 20-percent decrease.

For one breeder, APHIS imposed a penalty for numerous violations including inadequate veterinary care, feeding, watering, and cleanliness.  Due to excessive reductions allowed by the new worksheet, the breeder's penalty was 97 percent lower than if calculated using the old worksheet.  Moreover, the reductions were so excessive that in 12 of 94 cases (13 percent), the worksheet generated a negative stipulation.  When this occurred, the agency issued a minimum stipulation.

---

[63] To determine the impact of recent changes to the penalty worksheet, we continued to review stipulations because they were the focus of our last audit. Since APHIS issued its new worksheet and revised penalty guidelines in April 2006, we selected cases after FY 2006 to give the agency time to implement the changes.



Chart 2: Comparison of Penalties Using Both Old and New Worksheets

During a 14-month period, IES lacked controls over the minimum stipulation amount in that it changed four times, as shown in table 2.

Table 2: Penalties Calculated with the New Penalty Worksheet

| Case No. | Stipulation date | No. of Violations | Maximum Penalties[a] | Stipulation Recommendation[b] | Minimum Stipulation Issued |
|---|---|---|---|---|---|
| 1 | 8/25/06 | 9 | $25,750 | ($231) | $250 |
| 2 | 10/4/06 | 16 | $55,000 | ($325) | $200 |
| 3 | 10/13/06 | 14 | $46,500 | ($1,163) | $200 |
| 4 | 11/8/06 | 44 | $165,000 | ($24,469) | $250 |
| 5 | 11/22/06 | 7 | $26,250 | ($937) | $250 |
| 6 | 2/8/07 | 7 | $26,250 | ($2,906) | $250 |
| 7 | 8/3/07 | 1 | $3,750 | ($281) | $275 |
| 8 | 8/6/07 | 31 | $97,500 | ($11,344) | $250 |
| 9 | 8/30/07 | 2 | $5,500 | ($412) | $250 |
| 10 | 9/28/07 | 5 | $18,750 | ($469) | $250 |
| 11 | 10/2/07 | 15 | $56,250 | ($1,406) | $250 |
| 12 | 10/19/07 | 2 | $7,500 | ($188) | $250 |

a. These amounts were calculated by multiplying the number of violations by the maximum penalty authorized.
b. These amounts were calculated by applying so many reductions that the stipulations became a negative number.

We inquired why IES used different minimums. In March 2009, IES' chief of Enforcement and Operations Branch stated, "it is not possible to glean from the email exchanges between the enforcement specialist and the program official why [this occurred]." Other IES officials also had no explanation about how the different minimums were calculated for the cases.

Based on the discussion above, we concluded that APHIS should limit total penalty reductions on its new worksheet to less than 100 percent and establish a minimum stipulation amount to be consistently applied.

**CONGRESS INCREASED MAXIMUM PENALTIES**

Since 1970, Congress and the Department have steadily increased the maximum penalty amount for AWA violations (see chart 3).[64]  The most recent increase was an unprecedented $10,000 per violation, as implemented by the 2008 Farm Bill.[65]  The House Committee on Agriculture stated that this increase was to "strengthen fines for violations of the Animal Welfare Act."[66]



Chart 3: Maximum Penalties Authorized vs. Average Actual Penalties Assessed

While Congress and the Department continued to increase the maximum penalty, the average penalties actually assessed by APHIS represented less than 10 percent of the maximum.[67]  Lower penalties could be an indication that the violations were all minor or insignificant; however, we found that this was not the case.  Serious violations (e.g., those that compromise animal health) and grave violations (e.g., those that directly harm animals) made up nearly 60 percent of all violations from October 2006 to April 2008.

**APHIS CONTENDS THAT ASSESSED PENALTIES ARE APPROPRIATE**

We inquired why the new worksheet did not produce the higher penalties that the agency previously told us it would.  APHIS officials responded that there is no requirement to impose the statutory maximum penalty for violations.  We agree and we are not advocating that APHIS assess the maximum penalty.  However, as previously stated, we do recommend that APHIS issue more reasonable stipulations by limiting total penalty reductions on its new worksheet to less than 100 percent.

---

[64] From 1970 to 2009, USDA approved two increases to account for inflation; Congress authorized two significant increases that totaled two and a half times the previous maximum amount.

[65] Public Law 110-246, Sec. 14214 (June 18, 2008). The increased maximum penalty did not apply to the cases we analyzed.

[66] The Fact Sheet for the Conference Report—2008 Farm Bill Miscellaneous Title.

[67] For 2006, we used actual data from IES' annual report. For 2007 and 2008, we averaged the actual stipulation amounts from the 94 cases.

In addition, APHIS stated that stipulations increased using the new worksheet. To support this, the agency compared the average stipulation before our 2005 audit report to the average stipulation after our 2005 audit report. However, the agency did not consider factors that affected the average stipulation, such as the gravity of violations, size of business, violation history, and increases in the authorized maximum penalty.

To determine the impact of these factors, we reviewed stipulation cases collected for our 2005 audit[68] and found: (1) the violations after 2005 were more serious than those in earlier years;[69] (2) the size of business of the violators after 2005 was larger;[70] (3) more violators after 2005 had a violation history;[71] and (4) the maximum penalty increased since our last audit.[72] Since the above factors increased stipulations, we disagree that stipulations increased because of the new worksheet.

Finally, APHIS stated that OIG recommended it produce higher penalties without regard to penalty precedent established by the courts, which is binding on APHIS. It also stated that the JO routinely imposes a fraction of the statutory maximum penalty even for the most egregious violations.

APHIS' legal proceedings were not the focus of our audit. However, to validate APHIS' statement, we reviewed the seven cases the agency provided. We found:

- In three cases, the JO imposed the same or almost the same penalty that APHIS asked for.[73]

- In three other cases, the JO reduced the civil penalty because APHIS either did not provide sufficient evidence or used the wrong maximum penalty amount.[74]

- In the last case, the JO did not impose a penalty because he found that AWA and the regulations were ambiguous on the issue.[75]

In 1995 and again in 2005, we reported that the monetary penalties were often so low that violators regarded them as a cost of business and that APHIS reduced the stipulations making them basically meaningless. In our current audit, we found that this problem has not yet been corrected. APHIS continues to impose negligible stipulations by applying excessive reductions (up to 145 percent) to the maximum penalties. To correct this on-going problem, the agency needs to issue stipulations that will serve as a better deterrent for encouraging violators to comply with the law.

---

[68] We reviewed 77 of 197 cases closed from 2002 to 2004, the sample selected during our last audit.
[69] Serious and grave violations made up nearly 60 percent of all violations in our sample after 2005, whereas serious and grave violations only accounted for 11 percent of cases before 2005.
[70] Large businesses made up 30 percent of all violators in our sample after 2005, whereas large businesses only accounted for 13 percent of cases before 2005.
[71] Over 38 percent of the violators had a violation history in our sample after 2005, whereas only 26 percent of the violators had a violation history of cases before 2005.
[72] The maximum penalty increased from $2,750 to $3,750 in 2005, a 37 percent increase.
[73] *Marilyn Shepherd*, AWA Docket No. 05-0005, *Lorenza Pearson*, AWA Docket Nos. 02-0020 and D-06-0002, and *Jewel Bond*, AWA Docket No. 04-0024.
[74] *Martin Colette*, AWA Docket No. 03-0024, *Jerome Schmidt*, AWA Docket No. 05-0019, and *Karen Schmidt*, AWA Docket No. 03-0024.
[75] *Daniel Hill,* AWA Docket No. 06-0006

---

### Recommendation 8

Limit total penalty reductions on the new worksheet to less than 100 percent.

### Agency Response

APHIS agrees with this Recommendation. We will develop and implement a new worksheet which limits total penalty reductions to less than 100 percent by September 30, 2010.

### OIG Position

We accept APHIS' management decision on this recommendation.

### Recommendation 9

Establish a methodology to determine a minimum stipulation amount and consistently apply that amount, when appropriate.

### Agency Response

APHIS agrees with this Recommendation. We will formally document the "minimum stipulation amount" in the "Determining Penalties Under the Animal Welfare Act" document by September 30, 2010.

### OIG Position

We accept APHIS' management decision on this recommendation.

## Finding 4:  APHIS Misused Guidelines to Lower Penalties for AWA Violators

In completing penalty worksheets, APHIS misused guidelines in 32 of the 94 cases we reviewed to lower the penalties for AWA violators. Specifically, it (1) inconsistently counted violations; (2) applied "good faith" reductions without merit; (3) allowed a "no history of violations" reduction when the violators had a prior history; and (4) arbitrarily changed the gravity of some violations and the business size. APHIS assessed lower penalties as an incentive to encourage violators to pay a stipulated amount rather than exercise their right to a hearing. As a result, APHIS did not consistently assess penalties among violators, which led to some violators not receiving their full penalty according to APHIS' guidelines.

Under AWA, "each violation and each day during which a violation continues shall be a separate offense." However, APHIS "shall give due consideration to the appropriateness of the penalty with respect to the size of the business, . . . the gravity of the violation, the person's good faith, and the history of previous violations."[76]  Based on prior ALJ and JO decisions, APHIS'

---

[76] 7 U.S.C. §2149(b) (January 1, 2007).

Monetary Penalty Action Team established guidelines in 2006 that elaborated on the use and amount of penalty reductions.[77]

After AC completes an inspection and considers enforcement action against a violator, it may request an IES investigation generally depending on the severity of the violations. If the investigation confirms the violations, AC may request that a stipulated (i.e., compromised) penalty be offered to the violator, who in return gives up his right to a hearing. IES, in coordination with AC, calculates the penalties while allowing reductions consistent with those listed in AWA.

In 32 of the 94 stipulation cases closed from October 2006 to April 2008, we found that APHIS misused guidelines in completing the penalty worksheet. (Since some individual cases contained multiple errors, the following add up to more than 32 cases.)

- In 18 cases involving animal deaths or unlicensed wholesale activities, APHIS used a smaller number of violations than the actual number.

- In 13 cases, APHIS applied a 50-percent or 25-percent good faith penalty reduction without supporting evidence or with contradictory evidence.

- In 22 cases, APHIS applied a penalty reduction, established for violators with no prior violation history, to violators that had a prior history.

- In 1 case, APHIS arbitrarily reduced the gravity of some violations and the size of the business from what was originally reported on the penalty worksheet.

We concluded that APHIS applied these penalty reductions without merit for the purpose of lowering penalties. AC regional management told us that they wanted to assess penalties that the violators would agree to pay rather than exercise their right to a hearing.

**VIOLATIONS INCONSISTENTLY COUNTED**

In our prior audit report, we recommended that APHIS calculate penalties on a per animal basis, as appropriate.[78] In September 2006, APHIS' prior Administrator agreed stating, "the criteria for total number of violations is calculated on a 'per animal, per day' basis."[79] Our review of the 94 cases disclosed that APHIS used this criterion only in cases involving animal deaths or unlicensed wholesales. However, because APHIS did not include the "per animal" part in its guidelines, this practice was not consistently followed, as discussed below.

In five cases involving animal deaths, APHIS calculated penalties based on one violation even though multiple animals died in each case. For example, in 2006 an airline company transported eight puppies from Europe to New York. Five puppies died because they were not adequately fed or hydrated. APHIS cited the violator for one grave violation for the deaths of the five

---

[77] "Determining Penalties Under the Animal Welfare Act" (April 2006).
[78] OIG Audit No. 33002-3-SF "APHIS Animal Care Program Inspection and Enforcement Activities" (September 2005).
[79] Memorandum from the Administrator to the Assistant Inspector General (September 21, 2006).

puppies.  However, considering previous ALJ and JO decisions, APHIS should have counted each dead animal as a grave violation.[80]

In 13 cases involving unlicensed wholesales,[81] APHIS calculated penalties for unlicensed breeders based on the day the violation occurred even though multiple animals were sold each day.  For example, an unlicensed breeder in Indiana sold a total of 19 puppies on 2 separate dates to a pet store.  APHIS cited the violator for two violations, one for each date of occurrence instead of one for each animal.

Further, the penalties for wholesaling without a license were so low that in some cases, there was no incentive to be licensed.  The penalties represented only a fraction of the amount that the violator would have paid in license fees.  As a result, in addition to avoiding inspections, the violator had a financial advantage by not being licensed.  For example, an unlicensed breeder in South Dakota was caught wholesaling 24 puppies from 2004 to 2006.  APHIS imposed a stipulation of $200.  The license fee for the 3-year period would have been $695—more than three times the amount of the stipulation.

We also found many cases where IES calculated the penalty two ways—one on a "per animal" basis and the other on "date of occurrence"—allowing AC regional management to choose the one that they believed the violators would pay.  However, guidelines should sufficiently detail exactly how penalties are to be calculated.  Given a set of circumstances, the worksheet should generate only one penalty amount, regardless of the violators' willingness to pay.

**GOOD FAITH PENALTY REDUCTION**

As discussed in the previous finding, APHIS revised the penalty worksheet by adding a good faith factor.  Good faith is defined in the guidelines as "a person who shows good faith may be willing to comply and correct violations; have animals that are in good health that do not suffer as a result of the violations. . . . In contrast, [a person who] lacks good faith may: have repeat violations . . . engage in regulated activity after having surrendered their license or after being notified of the Act's licensing requirements."[82]

If the violator demonstrates good faith, APHIS reduces the statutory maximum on the penalty worksheet by 50 percent.  If the violator demonstrates a lack of good faith, a penalty reduction is not applied.  However, APHIS established a third penalty reduction—25 percent—which it gives to the majority of violators that are unable to show either evidence of good faith or a lack of it— no evidence either way.

We found 13 cases where the agency applied a 50-percent or 25-percent good faith penalty reduction without merit.  Two examples are:

- At a facility in Tennessee, AC cited 22 violations, some of which caused animal deaths. When AC re-inspected the facility 5 months later, the inspector cited 12 more violations,

---

[80] "Consistent with established Department policy, when a regulated entity fails to comply with the Act, the regulations, or the standards, there is a separate violation for each animal consequently harmed or placed in danger." (Delta Airlines, Inc. 53 Agric. Dec. 1076 (1994)).
[81] AWA requires wholesale pet breeders to be licensed (7 U.S.C.  §2133, January 1, 2007).
[82] "Determining Penalties Under the Animal Welfare Act," pg. 4 (April 2006).

4 of which were repeats that caused additional deaths.[83]  In a letter dated July 3, 2007, the regional director stated that "we have no evidence of good faith."  Nonetheless, when APHIS calculated the penalty for all 34 violations, the violator received a 50-percent good faith penalty reduction.  We concluded that the violator had actually displayed a lack of good faith by not correcting previous violations that caused the additional deaths.

- One licensed breeder in Ohio, with no veterinary qualifications, operated on a pregnant dog without anesthesia; the breeder delayed calling a veterinarian and the dog bled to death.  The inspector also found that 40 percent of the dogs in the kennel were blind due to an outbreak of Leptospirosis.[84]  The inspector determined that the facility's water was contaminated and had caused the outbreak.

  Guidelines state that "a person who shows 'good faith' . . . [has] animals that are in good health that do not suffer as a result of the violations . . ."[85] Despite the lack of good faith demonstrated by the breeder, APHIS applied a 25-percent good faith penalty reduction to lower the penalty.  Four months later, a subsequent inspection continued to document violations at the facility.  The inspector reported that "this is a veterinary care issue that continues to be a serious problem—failure to provide adequate veterinary care for over 200 adult dogs."

## HISTORY OF VIOLATIONS

A history of violations is defined as a previous violation of AWA or a "pattern of ongoing violations."[86]  When there is no prior history of violations, the guidelines allow a 25-percent penalty reduction.

We found that in 22 cases, APHIS allowed a 25-percent reduction of the maximum penalty amounts for "no prior history of violations," even though the violators had a prior history of violations, as shown in the IES tracking system or through our review of the case files.  Two examples are:

- A breeder in Ohio with about 62 adult dogs was cited for 1 minor, 16 significant, and 12 serious violations during 5 inspections between 2005 and 2006.  The violations included the breeder's failure to inform his attending veterinarian that some of his dogs delivered dead puppies, which is important if the puppies died of a disease like Brucellosis.[87]  The breeder was also cited for administering medications to his dogs without his attending veterinarian's knowledge.  Although the breeder was issued an official warning in 2005 for numerous violations including inadequate veterinary care, APHIS gave him a 25-percent penalty reduction in 2007 for "no prior history of violations."

---

[83] The agency incorrectly used 32 violations on the worksheet when the settlement agreement, which was sent to the breeder, showed 34.
[84] This is a bacterial disease that affects animals as well as humans and causes damage to the inner lining of blood vessels.  The liver, kidneys, heart, lungs, central nervous system, and eyes may be affected.
[85] "Determining Penalties Under the Animal Welfare Act," pg. 4 (April 2006).
[86] "Determining Penalties Under the Animal Welfare Act," pg. 5 (April 2006).
[87] This is an infectious bacterial disease, which is spread through contact with aborted fetuses and discharges from the uterus of infected bitches, during mating, through maternal milk, and possibly through airborne transmission in some cases.  The bacteria enter the body through mucous membranes and spreads from there to lymph nodes and the spleen.  It also spreads to the uterus, placenta, and prostate gland as well as other internal organs at times.

- An unlicensed breeder in Indiana with 200 adult dogs received an official warning in 2002 for wholesaling to pet stores. In 2006, the breeder (still unlicensed) was found wholesaling puppies to a pet store in Florida. When calculating the penalty for this violation, APHIS gave the breeder a 25-percent "no history of violations" penalty reduction, even though the breeder had received an official warning in 2002.

## GRAVITY OF VIOLATIONS AND SIZE OF BUSINESS

AWA also allows APHIS to consider the gravity of violations and size of a business when determining a penalty. However, we found one case where APHIS arbitrarily reduced the gravity of the violations and the size of the business in order to lower the violator's penalty. A broker in North Carolina knowingly purchased puppies from an unlicensed breeder and failed to ensure that the puppies were at least 8 weeks old at the time of purchase. Both are considered serious violations according to guidelines. The violator should have been considered a large business because he purchased and sold over 500 animals a year.[88]

Originally, APHIS assessed the broker a stipulation of $4,500. After receiving an eight-page letter from the broker claiming hardship in paying the penalty, AC regional management altered the gravity of the violations from serious to both significant and minor to allow an additional 15-percent penalty reduction. It also altered the size of the business from medium to small to allow another 10-percent penalty reduction. As a result, the penalty was reduced from $4,500 to $1,687.

Guidelines state that "some factors . . . are not relevant to determining monetary penalties, including, among other things: inability to pay, disability, infirmity, need for income, effect on business or family."[89] The regional manager, who participated as a team member in establishing these guidelines, told us that the broker's letter addressed mitigating factors. However, after reviewing the letter, we saw no evidence to justify the changes made to the penalty.

As these conditions demonstrate, when the worksheet yielded penalties that regional managers considered excessive, they misused guidelines to lower the penalties. This resulted in some violators not receiving their full penalty and penalties not being consistently applied among violators. Therefore, we recommend that APHIS designate a responsible party to ensure that the guidelines established by its Monetary Penalty Action Team are consistently followed. Also, APHIS should include instructions in the guidelines to count each animal as a separate violation in cases involving animal deaths or unlicensed wholesale activities.

### Recommendation 10

Designate a responsible party to ensure that "Determining Penalties Under the Animal Welfare Act" (April 2006) is consistently followed by AC and IES and that penalties are properly calculated.

---

[88] The guidelines state "dealers [that] purchased, sold, or transported 405 animals during a two-year period" should be considered large-sized.
[89] "Determining Penalties Under the Animal Welfare Act," pg. 5 (April 2006).

**Agency Response**

APHIS agrees with this Recommendation. We recently reorganized the enforcement component of our Investigative and Enforcement Services (IES) to establish two branches: the Animal Health and Welfare Enforcement Branch (AHWEB) and the Plant Health and Border Protection Enforcement Branch. A GS-14 Chief will supervise each branch with full supervisory authority for branch staff. The Chief of AHWEB and his/her subordinate staff are responsible for EAs involving only AC and the APHIS Veterinary Services programs, greatly increasing the level of staff specialization afforded to these programs when compared to that in place during the audit. The Chief of AHWEB will assume responsibility for ensuring that AWA penalty calculations are consistent and in accordance with the instructions included in "Determining Penalties Under the Animal Welfare Act." In an instance where the AWHEB Branch Chief is unavailable or the position is vacant, the IES Deputy Director will assume this responsibility.

**OIG Position**

We accept APHIS' management decision on this recommendation.

## Recommendation 11

Include instructions in "Determining Penalties Under the Animal Welfare Act" to count each animal as a separate violation in cases involving animal deaths and unlicensed wholesale activities.

**Agency Response**

APHIS partially agrees with this Recommendation. The Recommendation is not always practical for unlicensed wholesale activities. We will request an opinion from Office of the General Counsel about a penalty structure for unlicensed wholesale activities by September 30, 2010. However, we will count each animal as a separate violation when an animal death results from NCIs. Specifically, AC will clarify the penalty guidelines by September 30, 2010, to count each animal as a separate violation when an animal death resulting from NCIs is involved.

**OIG Position**

We agree with APHIS' corrective action. However, our concern remains whether APHIS will count the violations for unlicensed wholesale activities consistently. To achieve management decision, APHIS needs to provide us with a copy of the Office of the General Counsel's opinion.

---

## Section 3:  Internet

## Finding 5:  Some Large Breeders Circumvented AWA by Selling Animals Over the Internet

Large breeders that sell AWA-covered animals over the Internet (hereafter referred to as Internet breeders) are exempt from AC's inspection and licensing requirements.  This occurred because the AWA section that excludes retail pet stores (i.e., stores that sell directly to the public) from its provisions pre-dates the Internet and creates a loophole for these breeders to circumvent AWA.  As a result, an increasing number of Internet breeders are not monitored for their animals' overall health and humane treatment.

AWA requires that "animals intended for use . . . as pets are provided humane care and treatment" and that breeders of such animals be licensed and inspected.  AWA exempts small businesses and retail pet stores from its provisions, although it did not define the term "retail pet stores."[90]

AWA was originally passed in 1966, long before the widespread use of the Internet.  With the explosion of the Internet in the 1990s, it became possible for large breeders to circumvent AWA by selling directly to the public without an APHIS license and regular inspections.  However, these retail breeders should not be categorized as retail pet stores or small businesses and, therefore, should not be exempted from AWA requirements for the reasons discussed below.

- Retail Pet Store Exemption.  In 1971, APHIS defined the term retail pet store as "any retail outlet where animals are sold only as pets at retail."[91]  At that time, retail pet stores generally sold to local consumers.  With the arrival of the Internet, the definition was broadly interpreted to include Internet breeders because they also sell directly to consumers.  However, these breeders are no longer limited to local consumers but can sell and transport animals nationwide.

  Also, the former Secretary stated that "retail [outlets] are already subject to a degree of self-regulation and oversight by persons who purchase animals from the retailers' homes."[92]  However, for Internet breeders, there is no degree of self-regulation and oversight because consumers do not have access to their facilities.  Without consumer oversight or APHIS inspections, there is no assurance that the animals are monitored for their overall health and humane treatment.

- Small Business Exemption.  A small business is one that "derive[s] less than a substantial portion of his income (as determined by the Secretary) from the breeding and raising of dogs or cats on his own premises and sells any such dog or cat."[93]  The Secretary determined that "any person who maintains a total of three or fewer breeding female dogs . . . which were born and raised on his or her premises, for pets or exhibition" or "any

---

[90] 7 U.S.C. §2131, §2133, and §2134 (January 3, 2007).
[91] 9 CFR §1.1 (December 23, 1971).
[92] Doris Day Animal League v. Veneman (August 2003).
[93] 7 U.S.C. §2133 (January 3, 2007).

person who sells fewer than 25 dogs and/or cats per year, which were born and raised on his or her premises . . . to any research facility" is exempted.[94]

However, many Internet breeders do not fall in the small business category because they have more than three breeding females. Some are very large breeders that derive a substantial income from the breeding of dogs. For example, one Internet breeder we visited in Iowa had over 140 breeding dogs and generated sales of $160,000 in 2007.

In April 2009, APHIS publicly acknowledged that not requiring Internet breeders to be licensed and inspected is "a massive loophole."[95] To quantify the loophole, we used two search engines to identify how many of these breeders were licensed in two of our eight sampled States. We identified 138 breeders that had more than 3 breeding females or handled more than 25 dogs a year. We found 112 of the 138 (81 percent) were not licensed by APHIS. If these breeders had sold their dogs wholesale (i.e., not retail through the Internet), they would have needed a license.

Without a license, these breeders are not monitored or inspected for their animals' overall health and humane treatment. With the dramatic increase in online sales, consumers who purchased dogs in this manner sometimes found health problems with their dogs. Examples of some consumer complaints are listed below:

"This one pound puppy was very sick when she arrived . . . my vet informed me that she was suffering from severe hypoglycemia and massive infestations of Giardia, Threadworm, Roundworm and Coccidia. She also had two groin hernias. Her blood glucose level was dangerously low so she was immediately put on an IV."—source: an OIG Hotline Complaint.

"The [puppies] were mutts with poor body conformation, crooked teeth and were completely unsocialized. No health records came with the dogs and the information on the website was completely false."—source: a Better Business Bureau sponsored website.

"After suffering from numerous health issues that cost . . . thousands of dollars in vet bills, [the puppy] died when he was just eight months old."—source: San Francisco Chronicle.

"A breeder with a criminal record for animal cruelty was selling hundreds of puppies on the Internet."—source: USA Today.

To ensure that large Internet sellers are inspected, APHIS should propose that the Secretary seek legislative change to cover these sellers under AWA. Specifically, the agency should propose that the Secretary recommend to Congress that it exclude Internet sellers from the definition of "retail pet store," thereby ensuring that large breeders that sell through the Internet are regulated under AWA.

---

[94] 9 CFR §2.1 (January 1, 2005)
[95] "A (Designer) Dog's Life," *Newsweek (*April 13, 2009)

**Recommendation 12**

Propose that the Secretary seek legislative change to exclude Internet breeders from the definition of "retail pet store," and require that all applicable breeders that sell through the Internet be regulated under AWA.

**Agency Response**

APHIS agrees with this Recommendation. APHIS is currently providing information (including potential options) to Congress as requested regarding the proposed Puppy Uniform Protection and Safety Act (PUPS). This bill would place dogs sold directly to the public via the Internet, telephone, and catalogue sales within the jurisdiction of the AWA. In addition, APHIS will concurrently draft a legislative proposal for the Secretary by May 31, 2010.

**OIG Position**

We accept APHIS' management decision on this recommendation.

*Section 4:  Information System*

## Finding 6:  Security Controls Need to Be Addressed for AC's New Information System

AC started using the Animal Care Information System (ACIS), its new mission critical system,[96] before the Department's Cyber Security Office gave its concurrence to operate it.  This occurred because APHIS' Chief Information Officer (CIO) believed that the majority of the new system's security controls were operating as intended and recommended that it be implemented.  The Cyber Security Office disagreed with the CIO's assessment and identified issues in the concurrency review checklist.  As a result, there is no assurance that the new system has the security controls mandated by the Department.

Departmental Manual 3555-001 states, "all USDA IT systems require certification and accreditation prior to the system becoming operational. . . .  Certified systems will undergo an independent concurrence review by the ACIO-CS [Associate Chief Information Officer for Cyber Security] prior to submission to the DAA [Designated Accrediting Authority]."[97]  APHIS' condensed guide also states, "the concurrence of ACIO-CS with the [Certifying Official] is mandatory prior to submission to the DAA."[98]

Since 1994, AC has used LARIS (Licensing and Registration Information System) to record licensing and registration of all breeders, exhibitors, and other facilities and to document their inspection and violation histories.  After reviewing LARIS in our last audit,[99] we determined that this mission critical information system lacked certain key features that prevented it from effectively tracking violations and prioritizing inspection activities.  Also, it generated unreliable and inaccurate information, limiting its usefulness to AC inspectors and supervisors.  APHIS agreed with our recommendation for a new system.  However, due to contractor failure, APHIS did not start to develop ACIS (LARIS' replacement) until September 2007.

AC closed down LARIS on September 30, 2008, expecting that ACIS would be certified and accredited the next month.  However, the certification and accreditation did not occur the next month; in fact, AC did not have an operating information system for 5 months before launching the new system.  Throughout this period, inspectors worked without a system, manually tracking reports and calculating future inspection dates.[100]

By January 2009, APHIS' CIO believed that the majority of ACIS' security controls were in place and operating as intended.  The CIO recommended that ACIS be authorized for use, disregarding the required departmental concurrence review.  Based on the CIO's recommendation, the DAA (in this case, APHIS' deputy administrator) issued the authority to operate ACIS, and AC inspectors started using the new system.  Once the system became operational in March 2009, inspectors then had to enter the 5 months of accumulated data into the new system.

---

[96] Any system whose failure or disruption in normal business hours will result in the failure of business operations.
[97] *Departmental Manual* 3555-001, ch. 11, pt. 1 (October 18, 2005).
[98] *Certification and Accreditation Condensed Guide*, pg. 7 (April 24, 2007).
[99] Audit No. 33002-3-SF, "APHIS Animal Care Program Inspection and Enforcement Activities" (September 2005).
[100] LARIS and ACIS could not be run simultaneously on the inspectors' computers due to compatibility issues.  LARIS had to be removed before ACIS could be loaded.

However, the Department's Cyber Security Office did not concur with the CIO about the security controls and stated, "the documentation is [not] sufficient to support an accreditation decision and [it] will not issue an interim authority to operate . . . the issues we identified [in the checklists relate to the] system security plan, security controls compliance, contingency concurrency, and risk assessment."[101]  To comply with departmental policy, APHIS should address ACIS' security issues identified by USDA's Cyber Security Office during its concurrency review.  Controls should also be established regarding the closing down or launching of mission critical systems.

### Recommendation 13

Correct all security issues pertaining to ACIS that were identified by USDA's Cyber Security Office during its concurrency review.

### Agency Response

APHIS agrees with this Recommendation.  We have already corrected all security issues pertaining to ACIS.  Our corrective actions are documented in the attached memorandum entitled "Approval for Interim Authority to Operate for Animal and Plant Health Inspection Service Animal Care Information System (ACIS)," dated October 21, 2009.

### OIG Position

We accept APHIS' management decision on this recommendation.

---

[101] Memorandum to APHIS dated February 11, 2009.

*Section 5:  Debt Management*

## Finding 7:  IES Did Not Adequately Establish Payment Plans for Stipulations

IES did not adequately establish the payment plans for AWA violators that had stipulation agreements.  This occurred because IES did not follow the payment plan process that was presented by the Financial Management Division (FMD) during a meeting in 2004.  Further, FMD did not provide sufficient oversight or follow up of IES' debt management activities.  As a result, 20 payment plans totaling $92,896 were (1) established without verifying the violators' ability to pay, (2) not legally enforceable, and (3) not always established as accounts receivable.

Overall, FMD provides debt management services for APHIS and other agencies within the Department.  According to APHIS' Budget and Accounting Manual, "FMD is responsible for developing and implementing an effective debt management program for the Agency . . . and providing oversight of Agency debt management activities."[102]

To accomplish this, FMD partners with IES, which negotiates payment plans for violators that claim they are unable to pay the full amount of an agreed-upon stipulation.  In March 2004, FMD representatives met with IES to discuss the payment plan process and the responsibilities that IES would be expected to assume.  FMD did not provide further oversight.

We reviewed all 20 payment plans for stipulation agreements closed from October 2006 to April 2008.  In assuming debt management responsibilities, IES did not comply with several regulatory requirements involving all 20 plans—most having overlapping errors.  Specifically, we found that IES:

- Did not collect financial information when the violators claimed inability to pay.  After IES and a violator agree to a stipulation, the violator may either pay in full or if he is unable to do so, then negotiate a payment plan.  For all 20 plans, IES did not verify violators' eligibility to qualify for the plans.  Regulations require that plans must be based on debtor's inability to pay in a reasonable time, which should be supported by financial information, such as tax returns and credit reports.[103]  IES told us it was not aware of this requirement.

- Did not obtain legally enforceable written agreements (payment plans) from the violators.  After IES and the violator mutually agree to a payment plan, IES signs the document before sending it to the violator.  However, for 19 plans, IES did not require the violators to sign.[104]  Regulations require that debtors provide "a legally enforceable written

---

[102] APHIS' *Budget and Accounting Manual,* ch. 12 p. 2 (October 1, 2002).
[103] 31 CFR §902.2 (July 1, 2006).
[104] For one case, IES did not require the violator to sign the original payment plan.  After accepting its terms, the violator asked IES to renegotiate the fine to a lower amount, and IES agreed to do so but required the violator to sign the second payment plan that was generated based on the renegotiated amount.

agreement."[105]  To ensure this, APHIS' debt management policies require that the plans be signed by the debtor.[106]  IES was not aware of this requirement.

- <u>Did not forward documents to FMD to establish accounts receivable</u>.  For 7 payment plans, IES did not forward the required documents (i.e., settlement agreement, which includes the stipulation amount and plan) to FMD in order to establish accounts receivable.  Although IES' procedures require plans to be forwarded to FMD, IES could not provide a reasonable explanation why these plans were not.  Without establishing accounts receivable for the plans, FMD cannot track and collect the debt.

As these conditions demonstrate, IES did not adequately establish 20 payment plans in accordance with requirements.  Therefore, we recommend that FMD ensure that IES follows the payment plan process by conducting additional training and periodic reviews or reassume responsibility for establishing violators' payment plans.

### Recommendation 14

Require FMD to ensure that IES follows the payment plan process by conducting additional training and periodic reviews, or require FMD to reassume its responsibility for establishing payment plans for stipulations.

### Agency Response

APHIS agrees with this Recommendation.  IES will follow the applicable federal regulations and FMD Guidelines for Establishing Payment Plans when establishing payment plans.  Consistent with these authorities, in September 2009, IES and FMD developed the attached Memorandum of Agreement (MOA) for persons who request a payment plan.  IES has implemented the MOA in its International Organization for Standardization (ISO) Payment Plan process.  In addition, IES and FMD have developed a method to jointly review and reconcile payment plans, stipulations, and orders assessing penalties on a monthly basis.  IES' Chief, Document Control Branch, will train the IES personnel who handle payment plans, in accordance with FMD's Guidelines for Establishing Payment Plans and IES' ISO Payment Plan process.

### OIG Position

We accept APHIS' management decision on this recommendation.

---

[105] 31 CFR §901.8 (July 1, 2006).
[106] "Guidelines for Establishing Payment Plans" (February 12, 2009).

## Scope and Methodology

We conducted a nationwide review of AC's inspections of dealers and its enforcement of AWA during FYs 2006 through 2008. We performed fieldwork at the AC and IES national offices in Riverdale, Maryland; the two regional offices in Raleigh, North Carolina, and Fort Collins, Colorado; the FMD Financial Services Branch in Minneapolis, Minnesota; and 81 dealer facilities in 8 States (see exhibit B for a complete list of audit sites). We performed site visits from April 2008 through March 2009.

With data exported from the LARIS database,[107] we judgmentally selected eight States—Arkansas, Iowa, Minnesota, Missouri, Ohio, Oklahoma, Pennsylvania, and Texas—based on the number of licensed dealers operating in the States. We also considered the type of animal welfare laws or inspection programs that had been adopted by the States.

To accomplish our audit, we:

- _Reviewed Criteria_. We reviewed the pertinent laws and regulations governing the AC program and the current policies and procedures AC established as guidance for inspections and enforcement.

- _Interviewed APHIS Personnel_. We interviewed AC and IES national and regional office officials as well as 19 of the 99 inspectors to gain an understanding about the AC program, its inspections, and investigation procedures. We also interviewed FMD personnel to gain an understanding of the penalty collection process.

- _Visited 81 Dealer Facilities_. Using Audit Command Language software, we judgmentally selected 81 of 3,954 licensed dealers in our sampled States (33 in the Eastern Region and 48 in the Western Region). Generally, we selected the dealers based on the largest number of violations or repeat violations cited during our scope, the size of the facility, elapsed time since the last inspection, availability of its regular inspector, and proximity to other dealers in our sample.

  We accompanied 19 inspectors on their inspections of these dealers to (1) determine if the dealers were in compliance with AWA and related regulations and (2) evaluate the effectiveness of AC's enforcement actions. Of the 81 dealers we selected, 68 had been cited for violations since FY 2006.

- _Reviewed AC Inspection Reports and Files_. For the 81 dealers we visited, we reviewed inspection reports and other documentation in AC's files to determine if violations had been adequately addressed by the violators at re-inspections and, if not, whether appropriate enforcement action had been taken by AC.

- _Analyzed Total Violations Cited During Inspections_. We obtained nationwide data from LARIS of the violations cited during inspections in FYs 2006-2008. We then used Audit Command Language software to determine if the violators achieved compliance during

---

[107] The data was exported in April 2008.

re-inspections by comparing the total number of violators that were re-inspected during the period and the total number of those that continued to violate AWA.

- _Interviewed Veterinary Schools_.  We interviewed the directors of the Shelter Medicine Programs at three veterinary schools in California, Massachusetts, and New York to determine if some of the situations we encountered during our site visits constituted direct violations.

- _Reviewed Stipulations_.  At IES' national office, we reviewed all 94 stipulation cases that were closed from October 2006 to April 2008 to determine if (1) reductions offered by APHIS were appropriate and (2) penalties were calculated correctly.[108]  We then calculated the stipulation amounts using the old penalty worksheet for comparison.

  In addition, we compared the 94 cases in the current audit to the 77 stipulation cases from the 2005 audit to determine the factors that increased the average stipulation amount.[109]

- _Reviewed ALJ and JO Decisions_.  We reviewed all 16 AWA cases litigated by the Department where a decision was rendered on a licensed dealer from 2000 to 2009 to determine if AC supported its cases with sufficient evidence.

  In addition, we reviewed seven AWA cases (cited by APHIS) to determine the basis for the JO's decision.

- _Searched for Breeders Selling Puppies Over the Internet_.  We used two websites[110] to identify breeders that sold AWA-covered animals over the Internet.  We focused our search on two States—Missouri and Pennsylvania—based on the large number of breeders operating in these States.  We identified 138 breeders that had more than 3 breeding females or handled more than 25 dogs a year.  We compared information of these breeders to APHIS' active licensed breeder list to identify those not licensed by APHIS.  We also collected examples of consumer complaints related to Internet breeders.

- _Reviewed Outstanding AC Receivables_.  At FMD, we reviewed all outstanding AC receivables as of August 26, 2008, to determine if delinquent receivables were handled properly.  We also reviewed all 20 payment plans from the sampled IES stipulation cases to determine if the plans were processed according to requirements.

- _Conducted a Limited Review of ACIS_.  We did not verify the accuracy of AC's information system—ACIS—and make no representation of the adequacy of information generated from it.[111]  We did review the new system's certification and accreditation process, and the timeliness of its implementation.

---

[108] The stipulation cases included all facilities covered by AWA, such as dealers, research facilities and transporters.
[109] We excluded four stipulation cases from our 2005 sample because we had not obtained the worksheet, which showed the three factors.
[110] http://www.puppysites.com and http://puppydogweb.com.
[111] APHIS implemented the new system near the end of the audit.  Therefore, we did not verify its accuracy.

We conducted this performance audit in accordance with generally accepted government auditing standards.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives.  We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## *Abbreviations*

| | |
|---|---|
| AC | Animal Care |
| ACIO-CS | Associate Chief Information Officer for Cyber Security |
| ACIS | Animal Care Information System |
| ALJ | Administrative Law Judge |
| APHIS | Animal and Plant Health Inspection Service |
| AWA | Animal Welfare Act |
| CFR | Code of Federal Regulations |
| CIO | Chief Information Officer |
| DAA | Designated Accrediting Authority |
| FMD | Financial Management Division |
| FY | Fiscal Year (Federal) |
| IES | Investigative and Enforcement Services |
| JO | Judicial Officer |
| LARIS | Licensing and Registration Information System |
| OACIS | On-line Animal Care Information System |
| OIG | Office of Inspector General |
| U.S.C. | United States Code |

## *Exhibit A: Summary of Monetary Results*

| FINDING NUMBER | RECOMMENDATION NUMBER | DESCRIPTION | AMOUNT | CATEGORY |
|---|---|---|---|---|
| 3 | 8 | Although APHIS previously agreed to revise its penalty worksheet to produce "significantly higher" penalties for violators of AWA, the agency imposed penalties totaling $348,994, nearly 20 percent less than the $434,078 calculated using the old worksheet for the 94 stipulation cases we reviewed. | $85,084 | FTBPTBU* – Management or Operating Improvements/ Savings |
| 7 | 14 | IES did not adequately establish payment plans for stipulations totaling $92,896. | $92,896 | FTBPTBU – Improper Accounting |
| **TOTAL MONETARY RESULTS** | | | $177,980 | |
| *Funds to be put to better use | | | | |

## *Exhibit B: Audit Sites Visited*

| ORGANIZATION | LOCATION |
|---|---|
| **APHIS National Office** | |
|     Animal Care | Riverdale, MD |
|     Investigative and Enforcement Services | Riverdale, MD |
| | |
| **APHIS Eastern Regional Office** | |
|     Animal Care | Raleigh, NC |
|     Investigative and Enforcement Services | Raleigh, NC |
|     Dealer Facilities: | |
|         1 | Goodville, PA |
|         2 | Ephrata, PA |
|         3 | East Earl, PA |
|         4 | Lititz, PA |
|         5 | Ephrata, PA |
|         6 | Ronks, PA |
|         7 | Shippensburg, PA |
|         8 | Newburg, PA |
|         9 | Belleville, PA |
|         10 | Mill Creek, PA |
|         11 | Belleville, PA |
|         12 | Sugarcreek, OH |
|         13 | Sugarcreek, OH |
|         14 | Fresno, OH |
|         15 | Dundee, OH |
|         16 | Millersburg, OH |
|         17 | Millersburg, OH |
|         18 | Millersburg, OH |
|         19 | Millersburg, OH |
|         20 | Millersburg, OH |
|         21 | Mt. Sterling, OH |
|         22 | Columbus, OH |
|         23 | Fredericktown, OH |
|         24 | Brook Park, MN |
|         25 | Remer, MN |
|         26 | Nevis, MN |

| ORGANIZATION | LOCATION |
|---|---|
| 27 | Brewster, MN |
| 28 | Walnut Grove, MN |
| 29 | Luverne, MN |
| 30 | Ruthton, MN |
| 31 | Reading, MN |
| 32 | Walnut Grove, MN |
| 33 | Avoca, MN |
| **APHIS Western Regional Office** | |
| Animal Care | Fort Collins, CO |
| Investigative and Enforcement Services | Fort Collins, CO |
| Dealer Facilities: | |
| 34 | Dardanelle, AR |
| 35 | Pleasant Plains, AR |
| 36 | Booneville, AR |
| 37 | Booneville, AR |
| 38 | Everton, AR |
| 39 | Green Forest, AR |
| 40 | Harriet, AR |
| 41 | Mountainburg, AR |
| 42 | Hindsville, AR |
| 43 | Ozark, AR |
| 44 | Agra, OK |
| 45 | Jones, OK |
| 46 | Jones, OK |
| 47 | Atoka, OK |
| 48 | Coalgate, OK |
| 49 | Lane, OK |
| 50 | Tishomingo, OK |
| 51 | Atoka, OK |
| 52 | Duncan, OK |
| 53 | Duncan, OK |
| 54 | Lebanon, MO |
| 55 | Edgar Springs, MO |
| 56 | Edgar Springs, MO |
| 57 | Huggins, MO |
| 58 | Houston, MO |

| ORGANIZATION | LOCATION |
|---|---|
| 59 | Edwards, MO |
| 60 | Warsaw, MO |
| 61 | Dixon, MO |
| 62 | Dixon, MO |
| 63 | Cumberland, IA |
| 64 | Massena, IA |
| 65 | Audubon, IA |
| 66 | Thayer, IA |
| 67 | Bedford, IA |
| 68 | Allerton, IA |
| 69 | Humeston, IA |
| 70 | Leon, IA |
| 71 | Centerville, IA |
| 72 | Altoona, IA |
| 73 | Whitewright, TX |
| 74 | Tom Bean, TX |
| 75 | Wills Point, TX |
| 76 | Midlothian, TX |
| 77 | Wills Point, TX |
| 78 | Scroggins, TX |
| 79 | Simms, TX |
| 80 | De Kalb, TX |
| 81 | Simms, TX |
| **APHIS Financial Management Division** | Minneapolis, MN |

## *Exhibit C: Violations Cited at Dealer Facilities in FYs 2006-2008*

| VIOLATION | COUNT |
|---|---|
| Housing Facilities, General | 4,744 |
| Attending Veterinarian and Adequate Veterinary Care | 3,537 |
| Cleaning, Sanitization, Housekeeping, and Pest Control | 3,504 |
| Primary Enclosures | 3,170 |
| Access and Inspection of Records and Property | 2,900 |
| Outdoor Housing Facilities | 2,678 |
| Records: Dealers and Exhibitors | 1,601 |
| Time and Method of Identification | 1,260 |
| Sheltered Housing Facilities | 731 |
| Sanitation | 651 |
| Indoor Housing Facilities | 576 |
| Feeding | 546 |
| Watering | 459 |
| Facilities, General | 428 |
| Exercise for Dogs | 254 |
| Facilities, Indoor | 237 |
| Facilities, Outdoor | 165 |
| Notification of Change of Name, Address, Control | 124 |
| Procurement of Random Source Dogs and Cats, Dealer | 82 |
| Environment Enhancement To Promote Psychological Welfare | 71 |
| Employees | 69 |
| Minimum Age Requirements | 69 |
| Requirements and Application | 68 |
| Compatible Grouping | 60 |
| Records: Operators of Auction Sales and Brokers | 55 |
| Handling of Animals | 52 |
| Others (e.g., Health Certification, Space Requirements, Care in Transit, etc.) | 352 |
| **TOTAL** | **28,443** |

## *Exhibit D: Additional Photos Taken During Site Reviews*



<u>Missouri breeder violated AWA</u>: This dog had an injured leg, raw flesh and bones exposed.  The inspector correctly cited the breeder for lack of adequate veterinary care (9 CFR §2.40). The dog was eventually treated by a veterinarian.



<u>Texas breeder violated AWA</u>: This dog had an oozing sore on its head.  The inspector correctly cited the breeder for lack of adequate veterinary care (9 CFR §2.40), and required the breeder to take the dog to a veterinarian.



Ohio breeder violated AWA: This was an unsuitable kennel for puppies because their paws slipped through the wires, allowing regular contact with feces. The inspector correctly cited the breeder for failure to protect the dogs' feet from injury (9 CFR §3.6).



Texas breeder violated AWA: This dog had cloudy eyes covered with a heavy discharge, matted hair, and skin irritations. The inspector cited the breeder for lack of adequate veterinary care (9 CFR §2.40) and required the breeder to take the dog to a veterinarian for treatment. The inspector did not consider this a direct violation.



<u>Texas breeder violated AWA</u>: Dogs had drinking water that contained algae and feces. The water receptacle was also chewed and unclean. This is in violation of 9 CFR §3.10 for failure to provide clean and sanitized water to dogs and §3.11 for failure to keep water receptacles clean and sanitized. The inspector verbally told the breeder to clean the water receptacle but did not cite these violations.



<u>Arkansas breeder violated AWA</u>: This dog had a torn ear. The inspector correctly cited the breeder for lack of adequate veterinary care (9 CFR §2.40) and required the dog be taken to a veterinarian.

*Agency's Response*

# USDA'S

# ANIMAL AND PLANT HEALTH INSPECTION SERVICE

# RESPONSE TO AUDIT REPORT

**United States
Department of
Agriculture**

Animal and
Plant Health
Inspection
Service

Washington, DC
20250

**MEMORANDUM**

TO:            Gil H. Harden
               Assistant Inspector General
                for Audit

FROM:          Cindy J. Smith /S/
               Administrator

SUBJECT:       APHIS Response on OIG Report, "Animal and Plant
               Health Inspection Service's - Animal Care Program
               Inspections of Problematic Dealers" (33002-04-SF)

The Animal and Plant Health Inspection Service (APHIS) appreciates the
opportunity to comment on this report. We appreciate the Office of Inspector
General's (OIG) interest in our programs. We have provided a response for
each Recommendation.

**Recommendation 1: Modify the *Dealer Inspection Guide* to require an
enforcement action for direct and serious violations. Also, define a serious
violation in the Guide.**

**APHIS Response:** APHIS agrees with this Recommendation. We will provide
Animal Care (AC) employees with guidance regarding all enforcement action options
including direct and serious Non-Compliant Items (NCIs) drawn from OIG
recommendations, Office of the General Counsel (OGC) guidance, and legal
decisions. APHIS will incorporate the requirements in a new document entitled
"Inspection Requirements." This document will be distributed to and discussed with
AC employees during the AC National Meeting, April 19-22, 2010. APHIS will
update the *Dealer Inspection Guide* to include the information in the "Inspection
Requirements" document and consolidate it with the Research Facility Inspection and
the Exhibitor Inspection Guides into one comprehensive document. APHIS
anticipates completing the document consolidation by September 30, 2010.

**Recommendation 2: Remove "no action" as an enforcement action in the *Dealer
Inspection Guide*.**

**APHIS Response:** APHIS agrees with this Recommendation. We changed the title
of the "Enforcement Action Worksheet" to "Enforcement Action Option Worksheet"
and changed the flow chart title to read "Enforcement Actions (EA) Guidance for
Inspection Reports." We modified these to clarify that: (1) inspectors will forward

to AC management a recommended EA (they believe will be most effective in attaining compliance) for all repeats and directs and any facility with inspection results that cause it to go from a lower frequency to High Inspection Frequency; and (2) taking no immediate action requires Regional Director approval and a 90-day reinspection to determine if compliance was achieved or if EA is necessary. Copies of the modified worksheet and flow chart are attached. AC will retain copies of all EA sheets in the facility files in accordance with records retention guidelines. AC's supervisors verbally directed their employees to utilize the modified EA worksheet beginning on December 1, 2009. In addition, this will be reemphasized at the National Meeting.

**Recommendation 3: Incorporate instructions provided in the "Animal Care Enforcement Actions Guidance for Inspection Reports" into the *Dealer Inspection Guide* to ensure inspectors and their supervisors follow them in selecting the appropriate enforcement.**

**APHIS Response:** APHIS agrees with this Recommendation. We will provide AC employees with guidance regarding all EA options to recommend to AC management drawn from OIG recommendations, OGC guidance, and legal decisions. AC will incorporate the requirements in a new document entitled "Inspection Requirements." This document will be distributed and covered for AC employees during AC's National Meeting, April 19-22, 2010. APHIS will update the *Dealer Inspection Guide* to include the information in the "Inspection Requirements" document and consolidate it with the Research Facility Inspection and the Exhibitor Inspection Guides into one comprehensive document. APHIS anticipates completing the document consolidation by September 30, 2010.

**Recommendation 4: Modify regulations to allow immediate confiscation where animals are dying or seriously suffering.**

**APHIS Response:** APHIS agrees with the intent of this Recommendation, but believe that current regulations are sufficient to allow immediate confiscation. We believe that we can effect the intent of the Recommendation by reviewing and clarifying the confiscation processes so that confiscations can be accomplished with maximum speed and effectiveness. We will distribute the clarified guidance to employees during AC's National Meeting, April 19-22, 2010.

**Recommendation 5: Establish written procedures to refer animal cruelty cases to the States that have such felony laws.**

**APHIS Response:** APHIS agrees with this Recommendation. While the Animal Welfare Act (AWA) does not give APHIS the authority to determine if state or local animal cruelty laws have been violated, we do believe that we should work with state and local authorities in our shared goal of eliminating animal cruelty. APHIS will

refer issues of mutual interest to appropriate local authorities who enforce state laws and share inspection reports and EAs with several states that have state-level enforcement capability (e.g., Colorado, Iowa, Kansas, Missouri, and Pennsylvania). AC has modified the regional "Enforcement Action Option Worksheet" to include a check box for inspectors to indicate whether or not they contacted local or state authorities. A copy of the modified worksheet is attached. We will reemphasize with inspectors the need to notify appropriate authorities who enforce state humane laws during AC's National Meeting from April 19-22, 2010. APHIS will develop a Standard Operating Procedure to refer suspected animal cruelty incidents to appropriate authorities that have felony laws for animal cruelty. This document will be completed by September 30, 2010.

**Recommendation 6: Provide more comprehensive training and detailed guidance to the inspectors and supervisors on direct and repeat violations, enforcement procedures, evidentiary requirements (e.g., adequately describing violations), shelter medicine, and animal abuse.**

**APHIS Response:** APHIS agrees with this Recommendation. We have provided training for all inspectors on identifying direct and repeat NCIs and adequately describing NCIs, during fall 2009 meetings between supervisors and their inspector teams. We will provide additional training and guidance (i.e., the "Inspection Requirements" document) to inspectors and supervisors on identifying direct and repeat NCIs, adequately describing NCIs, enforcement procedures, and common medical conditions seen at commercial kennels during AC's National Meeting, April 19-22, 2010. In addition, we will provide a training session on shelter medicine at the National Meeting. We will develop a comprehensive technical training plan through the Center for Animal Welfare, by November 30, 2010.

**Recommendation 7: Revise the *Dealer Inspection Guide* to require photos for all violations that can be documented in this manner.**

**APHIS Response:** APHIS agrees with this Recommendation. Our current guidance calls for photographs of: direct NCIs; repeat NCIs; NCIs that may result in EA or an investigation; NCIs that are additional information for ongoing investigations; and transportation violations. In addition, our guidance states that inspectors may choose to take photographs in other circumstances. We will modify guidance to add NCIs documented on the third prelicense inspection and NCIs documented on inspections that may be appealed. We will reemphasize with inspectors when to take photographs. We will incorporate this information in the new "Inspection Requirements" document, and distribute it to employees during the AC National Meeting, April 19-22, 2010. APHIS will update the *Dealer Inspection Guide* to include the information in the "Inspection Requirements" document and consolidate it with the Research Facility Inspection and the Exhibitor Inspection Guides into one

comprehensive document.  APHIS anticipates completing the document consolidation by September 30, 2010.

**Recommendation 8:  Limit total penalty reductions on the new worksheet to less than 100 percent.**

**APHIS Response:**  APHIS agrees with this Recommendation.  We will develop and implement a new worksheet which limits total penalty reductions to less than 100 percent by September 30, 2010.

**Recommendation 9:  Establish a methodology to determine a minimum stipulation amount and consistently apply that amount, when appropriate.**

**APHIS Response:**  APHIS agrees with this Recommendation.  We will formally document the "minimum stipulation amount" in the "Determining Penalties Under the Animal Welfare Act" document by September 30, 2010.

**Recommendation 10:  Designate a responsible party to ensure that "Determining Penalties Under the Animal Welfare Act" (April 2006) is consistently followed by AC and IES and that penalties are properly calculated.**

**APHIS Response:**  APHIS agrees with this Recommendation.  We recently reorganized the enforcement component of our Investigative and Enforcement Services (IES) to establish two branches: the Animal Health and Welfare Enforcement Branch (AHWEB) and the Plant Health and Border Protection Enforcement Branch.  A GS-14 Chief will supervise each branch with full supervisory authority for branch staff.  The Chief of AHWEB and his/her subordinate staff are responsible for EAs involving only AC and the APHIS Veterinary Services programs, greatly increasing the level of staff specialization afforded to these programs when compared to that in place during the audit.  The Chief of AHWEB will assume responsibility for ensuring that AWA penalty calculations are consistent and in accordance with the instructions included in "Determining Penalties Under the Animal Welfare Act."  In an instance where the AWHEB Branch Chief is unavailable or the position is vacant, the IES Deputy Director will assume this responsibility.

**Recommendation 11:  Include instructions in "Determining Penalties Under the Animal Welfare Act" to count each animal as a separate violation in cases involving animal deaths and unlicensed wholesale activities.**

**APHIS Response:**  APHIS partially agrees with this Recommendation.  The Recommendation is not always practical for unlicensed wholesale activities.  We will request an opinion from OGC about a penalty structure for unlicensed wholesale activities by September 30, 2010.  However, we will count each animal as a separate violation when an animal death results from NCIs.  Specifically, AC will clarify the

penalty guidelines by September 30, 2010, to count each animal as a separate violation when an animal death resulting from NCIs is involved.

**Recommendation 12: Propose that the Secretary seek legislative change to exclude Internet breeders from the definition of "retail pet store," and require that all applicable breeders or brokers who sell through the Internet be regulated under AWA.**

**APHIS Response:** APHIS agrees with this Recommendation. APHIS is currently providing information (including potential options) to Congress as requested regarding the proposed Puppy Uniform Protection and Safety Act (or PUPS). This bill would place dogs sold directly to the public via the Internet, telephone, and catalogue sales within the jurisdiction of the AWA. In addition, APHIS will concurrently draft a legislative proposal for the Secretary by May 31, 2010.

**Recommendation 13: Correct all security issues pertaining to ACIS that were identified by USDA's Cyber Security Office during its concurrency review.**

**APHIS Response:** APHIS agrees with this Recommendation. We have already corrected all security issues pertaining to ACIS. Our corrective actions are documented in the attached memorandum entitled "Approval for Interim Authority to Operate for Animal and Plant Health Inspection Service Animal Care Information System (ACIS)," dated October 21, 2009.

**Recommendation 14: Require FMD to ensure that IES follows the payment plan process by conducting additional training and periodic reviews, or require FMD to reassume its responsibility for establishing payment plans for stipulations.**

**APHIS Response:** APHIS agrees with this Recommendation. IES will follow the applicable federal regulations and Financial Management Division's (FMD) Guidelines for Establishing Payment Plans when establishing payment plans. Consistent with these authorities, in September 2009, IES and FMD developed the attached Memorandum of Agreement (MOA) for persons who request a payment. IES has implemented the MOA in its International Organization for Standardization (ISO) Payment Plan process. In addition, IES and FMD have developed a method to jointly review and reconcile payment plans, stipulations, and orders assessing penalties on a monthly basis. IES' Chief, Document Control Branch, will train the IES personnel who handle payment plans, in accordance with FMD's Guidelines for Establishing Payment Plans and IES' ISO Payment Plan process.

Please note that OIG's characterization of 31 C.F.R. § 901.8 and FMD's Guidelines for Establishing Payment Plans differs from the plain language of those authorities. For example, OIG asserts that 31 C.F.R. § 901.8 states, "require that plans **must** be based on debtor's inability to pay in a reasonable time, which should be supported by

financial information," but the regulation actually states, "Agencies **should** obtain financial statements from debtors who represent that they are unable to pay in one lump sum and independently verify such representations whenever possible." (emphasis added)  Additionally, OIG states, "APHIS' debt management polices **require** that the plans be signed by the debtor," but FMD's Guidelines for Establishing Payment Plans actually state, "Agencies **may** accept installment payments notwithstanding the refusal of the debtor to execute a written agreement or provide financial statements."  (emphasis added)

We hope that with this memorandum you are able to reach management decisions.


Attachments

# Enforcement Action Option Worksheet

Licensee / Registrant Name:

License / Registration Number(s):

Customer Number:

Site No.(s):

Date(s) of Alleged Violation(s):

Date of Inspection Report(s):

Photos Included:                            ☐ Yes        ☐ No

Airbill Included:                            ☐ Yes        ☐ No        ☐ NA

Local or State Authorities Contacted  ☐ Yes      ☐ No        ☐ NA

---

Action Taken:

(Check one)
☐ **Reinspection within 90 days (complete information below)**
☐ **APHIS Form 7060**
☐ **Initiate investigation**
☐ **Add to current investigation/case**
☐ **Other (explain):**
☐

---

Basis for Recommendation of "Reinspection within 90 days":

_____ Violation(s) are not severe enough to necessitate enforcement action at this time

_____ Evidence that facility is making credible progress towards full compliance -  to be verified on reinspection.

_____ Other:  (Explain)

---

**SACS Signature**_____  **Date**_____

**RD Concurrence**_____  **Date**_____

Revised 11/18/09

**Animal Care**
**Enforcement Actions (EA) Guidance for Inspection Reports**



October 21, 2009

TO:          Marilyn Holland
             Chief Information Officer
             Animal and Plant Health Inspection Service

FROM:        Charles T. McClam  /S/  R. Coffee
             Deputy Chief Information Officer
             Office of the Chief Information Officer

SUBJECT:     Approval for Interim Authority to Operate for Animal and Plant
             Health Inspection Service (APHIS) Plant Health Information System
             (PHIS)

I have reviewed your request dated September 30, 2009, for an Interim Authority to
Operate (IATO) for PHIS.  I concur with your request for an IATO, effective for 90
days from the date of this memorandum under the following conditions.  APHIS will:

- Submit a security categorization document, privacy threshold
  analysis/privacy impact assessment, risk assessment and system
  security plan into the Cyber Security and Management (CSAM)
  system for review.
- Create Plans for Action and Milestones (POAMS) in CSAM that
  document the accreditation project.
- Operate the system with appropriate security controls in place.
- Submit bi-weekly reports to the Office of Cyber and Privacy Policy
  and Oversight as to the status of its accreditation activities.
- Continually monitor the security posture of the system to ensure that
  no security vulnerabilities arise.
- Ensure that any vulnerabilities reported during the continuous
  monitoring process do not result in any unacceptable risk to USDA
  operations and assets.
- Accredit the system before the IATO expires.

If you have any questions, please contact Valarie Burks, Associate Chief Information
Officer for Cyber and Privacy Policy and Oversight at 202-690-2396 or via e-mail at
Valarie.Burks@usda.gov.

 United States
Department of
Agriculture

Marketing and
Regulatory Programs

Financial
Management
Division

Minneapolis Financial Services Branch
 Debt Management Team
PO Box 3334
Minneapolis, MN  55403

AGREEMENT BETWEEN
UNITED STATES DEPARTMENT OF AGRICULTURE
ANIMAL AND PLANT HEALTH INPECTION SERVICE
AND
_____

TIN: _____    CASE # _____

This Agreement, dated this _____ day of _____ is between _____ of _____, and the United States Department of Agriculture, Animal and Plant Health Inspection Services, Financial Service Branch, Minneapolis, MN, hereinafter referred to as APHIS.

_____ acknowledges that a civil penalty debt is owed to APHIS in the principal amount of    . _____agrees to pay this amount to APHIS in monthly installments.  The first installment payment of _____ shall be due on _____with subsequent payments of _____ due on the (either 1st or 15th)  of each successive month, beginning _____.  Please annotate your case number on the payment.

_____understands the terms of this agreement and agrees as follows:

- In accordance with the Debt Collection Act of 1982 and the Debt Collection Improvement Act of 1996, late payments will be subject to interest and or penalty charges.

- In the event of default on the payment schedule (which default remains uncured for 60 days from the due date thereof), the total unpaid balance shall be immediately due and payable without demand or notice thereof.  The balance due will be unpaid principal, interest calculated from the first day following the due date of the payment schedule, and late payment penalty.

- Failure to complete payments agreed to in this payment plan will result in this debt being prepared for referral to the United States Department of Treasury for further collection action.

- The interest rate will be the current value of funds rate established by the Department of Treasury.  For late payments, interest will be charged from the first day following the due date of the payment.

- _____agrees to reference their USDA APHIS account number on all payments, and to remit all installment payments under this Agreement to the USDA APHIS lockbox bank in accordance with either of the following methods:

Mail Address:
USDA, APHIS, (Case #)
P.O. Box 979043
St. Louis, MO   63195

Physical Address:
U.S. Bank  (Case #)
Attn:  Gvmt Lockbox – P. O. Box 979043
1005 Convention Plaza
St. Louis, MO  63101

**Please return the signed agreement to:**

**USDA, APHIS, IES   (Case #)**
**Attn:  (Specialist name)**
**4700 River Road, Unit 85**
**Riverdale, MD  20737**

APHIS and _____ understand and will abide by all of the terms outlined in this agreement.

_____                    USDA Animal and Plant Health Inspection Service

_____(Signature)_____          _____(Signature)_____
( _print name)_____                              (Specialist & Phone #.) _____
                    Date                                                        Date

**APHIS - Protecting American Agriculture**
**Toll Free:  (877) 777-2128, Commercial:  (612) 336-3400, FAX:  (612) 370-2293**                    **An Equal Opportunity Employer**

T82 Payment Plan Agreement (11/09)